# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 9, 2013            Decided June 18, 2013

No. 11-5353

IN RE: POLAR BEAR ENDANGERED SPECIES ACT LISTING AND
SECTION 4(D) RULE LITIGATION–MDL NO. 1993,

SAFARI CLUB INTERNATIONAL, ET AL.,
APPELLANTS

v.

SALLY JEWELL, SECRETARY OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-mc-00764)

*Douglas S. Burdin* argued the cause for appellants. With him on the briefs were *Anna M. Seidman* and *Paul Minnich. Sean E. Summers* entered an appearance.

*Katherine W. Hazard* argued the cause for appellees. On the brief were *Maggie B. Smith* and *David Shilton*.

*Howard M. Crystal*, *Eric R. Glitzenstein*, *Brendan R. Cummings*, *Kassia R. Siegel*, and *Rebecca J. Riley* were on the brief for intervenors Humane Society of the United States,

et al. in support of appellee. *Benjamin H. Longstreth* and *Jason C. Rylander* entered appearances.

Before: ROGERS and TATEL, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: After listing the polar bear as a threatened species under the Endangered Species Act, the U.S. Fish and Wildlife Service, acting pursuant to a related statute—the Marine Mammal Protection Act—barred the importation of polar bear trophies. Hunters and hunting organizations challenge this determination, raising both statutory and procedural arguments. Finding them all without merit, the district court granted summary judgment to the Service. We affirm.

## I.

"[T]he largest of the living bear species," polar bears are characterized by their "large body size, a stocky form, and fur color that varies from white to yellow." *Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range* ("Listing Rule"), 73 Fed. Reg. 28,212, 28,212 (May 15, 2008). Evolutionarily adapted to sea-ice habitats, polar bears live in "ice-covered seas" in Russia, northern Europe, the Canadian Arctic, and parts of Alaska. *Id.* at 28,212–13. A 2006 study estimated the "total number of polar bears worldwide" to be 20,000–25,000, comprised of "19 relatively discrete populations" in different geographic regions. *See id.* at 28,215.

This case is not about living polar bears. Instead, it concerns polar bear trophies—"mount[s], rug[s] or other display item[s] composed of the hide, hair, skull, teeth,

baculum, bones, and claws of the specimen which [were] taken . . . during a sport hunt for personal, noncommercial use." 50 C.F.R. § 18.30(b)(1). Plaintiffs, Safari Club International and Safari Club International Foundation, along with individual hunters Ronald Kreider and Donald Hershey, seek to import polar bear trophies from sport hunts in the Canadian Arctic.

Two federal statutes, the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361 et seq., and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., govern the importation of polar bear trophies. Congress enacted the first of these statutes, the MMPA, because "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of" human activities. *Id.* § 1361(1). The MMPA restricts the importation and "taking"—i.e., harassing, hunting, capturing, or killing, *see id.* § 1362(13)—of polar bears, as well as other marine mammals such as seals, dolphins, walruses, and sea lions.

The MMPA establishes a "stepwise approach" to the conservation of marine mammals. Appellees' Br. 5. At step one, the statute imposes a general "moratorium on the taking and importation" of all marine mammals, regardless of the species' scarcity or abundance. *See* 16 U.S.C. § 1371(a). This moratorium has several enumerated exceptions, including one for importation of sport-hunted polar bear trophies. *Id.* § 1371(a)(1) (providing an exception to the general moratorium for "importation of polar bear parts . . . taken in sport hunts in Canada"). Specifically, section 104(c)(5) authorizes the Service to "issue a permit for the importation of polar bear parts (other than internal organs) taken in sport hunts in Canada" and provides that the Service "shall" do so when certain criteria are satisfied. *Id.* § 1374(c)(5)(A). Pursuant to this provision, the Service approved the issuance

of permits for importation of trophies from certain Canadian polar bear populations. *See* 50 C.F.R. § 18.30(i)(1).

Going beyond the general moratorium, step two of the MMPA's conservation scheme imposes additional protections for species the Secretary designates as "depleted." *See* 16 U.S.C. §§ 1371(a)(3)(B), 1372(b)(3). The MMPA defines the term "depleted" as "any case in which" (1) the Secretary "determines that a species or population stock is below its optimum sustainable population"; (2) an authorized State makes the same determination; or (3) "a species or population stock is listed as an endangered species or a threatened species under the Endangered Species Act of 1973." *Id.* § 1362(1). Two provisions of the MMPA prohibit importation of species that have been designated as depleted. Section 101(a)(3)(B) provides that:

> Except for scientific research purposes, photography for educational or commercial purposes, or enhancing the survival or recovery of a species or stock as provided for in paragraph (1) of this subsection, or as provided for under paragraph (5) of this subsection, during the moratorium no permit may be issued for the taking of any marine mammal which has been designated by the Secretary as depleted, and no importation may be made of any such mammal.

*Id.* § 1371(a)(3)(B). And section 102(b)(3) reads:

> Except pursuant to a permit for scientific research, or for enhancing the survival or recovery of a species or stock, issued under section 1374(c) of this title, it is unlawful to import into the United States any marine mammal if such mammal was . . . taken from a

> species or population stock which the Secretary has, by regulation published in the Federal Register, designated as a depleted species or stock . . . .

*Id.* § 1372(b)(3).

On May 15, 2008, the Service published a rule listing the polar bear as a threatened species under the ESA. *See Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range*, 73 Fed. Reg. 28,212 (May 15, 2008). In the same rule, the Service also determined that the listing had the effect of designating the polar bear as "depleted" under the MMPA and that MMPA sections 101(a)(3)(B) and 102(b)(3) thus barred continued importation of sport-hunted polar bear trophies under that statute. *Id.* at 28,236, 28,242, 28,301–02. As a consequence, the Service administratively closed Kreider's and Hershey's permit applications, which sought to import polar bears killed prior to the bear's threatened listing. In identical letters sent to Kreider and Hershey, the Service explained that, due to the polar bear's depleted status, the MMPA provision "allow[ing] for the import of sport-hunted polar bear trophies from Canada is no longer available, even if your bear was hunted prior to the effective date of the ESA listing."

A number of industry groups, environmental organizations, hunters, and states challenged the Listing Rule in several district courts. These challenges, including those by Kreider, Hershey, and the Safari Club, were consolidated as a Multidistrict Litigation case in the United States District Court for the District of Columbia. With respect to the actions challenging the Service's decision to list the polar bear as a threatened species under the ESA, the district court granted summary judgment to the Service, and we sustained that ruling earlier this year. *In re Polar Bear Endangered Species*

*Act Listing & Section 4(d) Rule Litigation*, 709 F.3d 1 (D.C. Cir. 2013). In a separate ruling, the district court also granted summary judgment to the Service on the issue now before us—whether the MMPA authorizes importation of sport-hunted polar bear trophies following the Listing Rule. According to the district court, the Service "properly concluded that the polar bear is a depleted species within the meaning of the MMPA as of the publication of the Listing Rule," meaning that "the MMPA mandates the Service's conclusion that sport-hunted polar bear trophies are no longer eligible for import as a result of the species' depleted status." *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litigation*, 818 F. Supp. 2d 240, 245 (D.D.C. 2011).

The Safari Club now appeals the district court's grant of summary judgment on the importation issue, raising both statutory and procedural challenges. Several conservation groups, including the Humane Society of the United States, have intervened on behalf of the Service. "In a case like the instant one, in which the District Court reviewed an agency action under the APA, we review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. National Mining Association*, 309 F.3d 808, 814 (D.C. Cir. 2002). In reviewing the Service's interpretation of the MMPA, a statute the agency has sole authority to administer with respect to polar bears and certain other marine mammals, we apply the familiar two-step analysis set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Because we conclude that Congress has "directly spoken to the precise question[s] at issue" here, we have no need to resolve the parties' debate about whether the Service's interpretation of the MMPA qualifies for *Chevron* step two deference. *Id.* at 842–43; *see also Pharmaceutical Research*

*& Manufacturers of America v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001).

## II.

We begin with the Service's argument that the Safari Club's claims are unripe for review. *See Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 48 (D.C. Cir. 1999) ("[A]n Article III court cannot entertain the claims of a litigant unless they are 'constitutionally and prudentially ripe.' " (quoting *Louisiana Environmental Action Network v. Browner*, 87 F.3d 1379, 1381 (D.C. Cir. 1996))). Although conceding that Hershey's and Kreider's challenges to the disposition of their permit applications are ripe, the Service contends that the Safari Club's challenge to the Listing Rule's import determination was "not fit for judicial review" "[a]t the time the Final Rule was published" because the Service had yet to "appl[y] the legal reasoning [in the Rule] to any particular case." Appellees' Br. 21. But because "ripeness is peculiarly a question of timing, it is the situation now . . . that must govern," *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974), not the situation at the time the Listing Rule was published. Viewed through this lens, the Safari Club's challenge to the Listing Rule is indisputably fit for judicial resolution. Not only does the Safari Club raise "purely legal" issues of statutory interpretation, but the Service has now applied the Listing Rule to dispose of individual permit applications, including those filed by Hershey and Kreider, thus demonstrating the finality of the agency's action and rendering further factual development unnecessary. *See Clean Air Act Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998) (ripeness doctrine's first requirement is concerned with "whether the issue 'is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final' " (quoting *NRDC v. EPA*,

22 F.3d 1125, 1133 (D.C. Cir. 1994))). Moreover, the Service nowhere disputes that the Safari Club will suffer hardship associated with the inability to import polar bear trophies if court consideration is withheld. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967) (ripeness doctrine's second requirement requires us to consider "the hardship to the parties of withholding court consideration"), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). We thus turn to the merits.

The Service's challenged determination rests on three premises: (1) that the polar bear's ESA listing had the effect of "designating" the species as depleted within the meaning of MMPA sections 101(a)(3)(B) and 102(b)(3); (2) that once these import prohibitions were triggered, polar bears could no longer be imported under section 104(c)(5)'s trophy import authorization; and (3) that these import prohibitions apply even to bears taken before the species was designated as depleted. The Safari Club disputes all three propositions and adds two procedural challenges. We consider each claim in turn.

**A.**

The Safari Club argues that sections 101(a)(3)(B) and 102(b)(3) pose no bar to trophy importation because the polar bear was never "designated" as a depleted species within the meaning of those provisions. Recall that the MMPA specifies three methods by which a species can become "depleted": (1) the Secretary "determines that a species or population stock is below its optimum sustainable population"; (2) an authorized State makes the same determination; or (3) "a species or population stock is listed as an endangered species or a threatened species under the [ESA]." 16 U.S.C. § 1362(1). According to the Safari Club, a species is "designated" as depleted only when an affirmative

determination is made, through the procedures set forth in MMPA section 115(a), that the species has fallen below its optimum sustainable population. When a species is instead listed as threatened under the ESA, the Safari Club contends that the species becomes depleted automatically and thus is not "designated" as depleted within the meaning of MMPA sections 101(a)(3)(B) and 102(b)(3).

The Safari Club places far too much emphasis on the term "designate." As the district court explained, because "the MMPA expressly identifies three methods by which a species earns 'depleted' status" and "[n]one of these methods is particularly defined or otherwise referred to as a 'designation,' " the "most natural reading of the statute" is "that a species may be designated as depleted through any one of these three methods." *In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d at 254. Indeed, other MMPA provisions refer to a species as being "designated" as depleted "because of" or "on the basis of" its listing as an endangered or threatened species under the ESA, thus demonstrating that Congress believed an ESA listing could amount to a "designation." *See* 16 U.S.C. §§ 1371(a)(5)(E)(i); 1387(a)(2).

Under the Safari Club's interpretation, moreover, whether a particular species is protected by the import prohibitions would turn on the procedural mechanism by which that species became depleted. Nothing in the legislative record, however, suggests that Congress intended such an odd result. The Safari Club insists that threatened species should be treated differently because, unlike species found to be presently below their optimum sustainable population, threatened species may "currently enjoy historically high population numbers" but be ESA-listed "because of predictions about [future] conditions." Appellants' Br. 41. But Congress thought otherwise: "species that are listed under the

Endangered Species Act are, *a fortiori*, not at their optimum sustainable population and, therefore, should be considered depleted." H.R. Rep. No. 97-228, at 16 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1458, 1466. In any event, even were a species in fact at its optimum sustainable population and listed as threatened based solely on predicted future conditions, the Safari Club fails to explain why, given the MMPA's overarching goal of protecting species "in danger of extinction or depletion," 16 U.S.C. § 1361(1), Congress would have wanted that species to drop below its optimum sustainable population before the MMPA's import prohibitions for depleted species could apply. We thus think it quite clear that Congress intended to extend the protections of sections 101(a)(3)(B) and 102(b)(3) to all depleted species, regardless of how they achieve their depleted status.

**B.**

The Safari Club next argues that MMPA section 104(c)(5) requires the Service to authorize importation of sport-hunted polar bear trophies even where the polar bear is designated as depleted under the MMPA. The district court rejected this argument, finding "the intent of Congress . . . clear" that section 104(c)(5) "must give way to restrictions on importing depleted species." *In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d at 253. We agree. Sections 101(a)(3)(B) and 102(b)(3) prohibit importation of depleted species, unless the importation falls into one of the narrow exceptions for specific purposes such as scientific research and enhancing survival of the species. *See* 16 U.S.C. §§ 1371(a)(3)(B), 1372(b). Importation of sport-hunted trophies is not among these enumerated exceptions. *See Andrus v. Glover Construction Co.*, 446 U.S. 608, 616–17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are

not to be implied, in the absence of evidence of a contrary legislative intent.").

Conceding the obvious—that neither section 101(a)(3)(B) nor section 102(b) exempts trophy importation—the Safari Club nonetheless insists that these provisions must give way to section 104(c)(5)'s "express and mandatory Congressional authorization of imports of legally harvested polar bears." Appellants' Br. 27. As the Safari Club sees it, these provisions are in irreconcilable conflict: section 104(c)(5) requires the Service to authorize importation of sport-hunted polar bear trophies (and contains no exception for depleted polar bears), whereas sections 101(a)(3)(B) and 102(b)(3) prohibit any such importation. Invoking a bevy of statutory construction canons, the Safari Club argues that section 104(c)(5) should govern because the provision (1) is "narrow, precise and specific" to importation of polar bear trophies; (2) was enacted later in time; and (3) would otherwise be rendered superfluous. Appellants' Br. 29–31 (internal quotation marks omitted).

These arguments rest on a mistaken premise. Read in context, the provisions in question do not conflict but instead operate in different spheres of the MMPA's stepwise scheme. Although section 104(c)(5) does authorize trophy importation, that provision—like the statute's other permit authorizations—remains subject to the MMPA's more stringent protections for depleted species. When Congress wanted permit authorizations, such as those for scientific research and enhancement, to apply even to depleted species, it made this clear by including exceptions for those purposes in sections 101(a)(3)(B) and 102(b). But Congress included no such exception for trophy importation, thus demonstrating, as the district court explained, that although "importation of sport-hunted polar bear trophies from Canada is a permissible

exception to the general moratorium on importing marine mammals and marine mammal products, it is not an authorized exception where depleted marine mammals are concerned." *In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d at 253.

## C.

In support of its argument that the import prohibitions apply only to polar bears taken after the species became depleted, the Safari Club first points to section 102(b)(3), which prohibits importation of any marine mammal "taken from a species or population stock which the Secretary has, by regulation published in the Federal Register, designated as a depleted species or stock." 16 U.S.C. § 1372(b)(3). According to the Safari Club, this provision applies only to mammals taken from species that had *already* been designated as depleted at the time they were taken. The district court disagreed, as do we. *See In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d at 256 & n.11. The provision refers not to mammals taken from species the Secretary *had* designated as depleted but instead mammals taken from species the Secretary *has* so designated. If Congress intended section 102(b)(3) to apply only to mammals taken after the species became depleted, it would have replaced the verb "has" with "had."

Reinforcing this conclusion, other provisions of section 102(b) are expressly limited by the phrase "at the time of taking." Specifically, sections 102(b)(1) and 102(b)(2), respectively, prohibit importation of mammals "pregnant at the time of taking" and "nursing at the time of taking." 16 U.S.C. § 1372(b)(1)–(b)(2). By contrast, section 102(b)(3) contains no language limiting its operation to species designated as depleted "at the time of taking." *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen

'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).

Alternatively, the Safari Club relies on section 101(a)(3)(B), but that provision cannot permit what section 102(b)(3) expressly prohibits without rendering the latter superfluous. *See Davis County Solid Waste Management v. EPA*, 101 F.3d 1395, 1404 (D.C. Cir. 1996) ("[I]t is of course a well-established maxim of statutory construction that courts should avoid interpretations that render a statutory provision superfluous."). Indeed, counsel for the Safari Club conceded as much at oral argument, stating that if the trophies in question cannot be imported under section 102(b)(3), "it doesn't help that they might be able to [be imported] under the other provision." Oral Arg. Rec. 15:13–15:19.

**D.**

This brings us finally to the Safari Club's procedural challenges.

The Safari Club first argues that the Service failed to comply with MMPA section 115(a) when it promulgated the Listing Rule. That provision requires the Service, in taking "any action . . . to determine if a species or stock should be designated as depleted," to follow certain procedural requirements, such as publishing in the Federal Register a call for assistance in obtaining scientific information and utilizing informal working groups to the extent feasible. 16 U.S.C. § 1383b(a). Acknowledging that it did not follow section 115(a)'s requirements, the Service contends that it had no obligation to do so. We agree. Section 115(a) applies only to actions "*to determine* if a species or stock should be

designated as depleted." *Id.* (emphasis added). This clearly refers to the first mechanism for designating a species as depleted—where "the Secretary . . . determines that a species or population stock is below its optimum sustainable population." *Id.* § 1362(1)(A). By contrast, where a species is listed under the ESA, it automatically becomes designated as depleted under the MMPA. *See id.* § 1362(1)(C). Accordingly, because an ESA listing *results* in a depleted designation under the MMPA but entails no "*determination*" to that effect, section 115(a) is inapplicable.

Next, the Safari Club argues that the proposed Listing Rule failed to provide adequate notice that the Service "was designating the polar bear as a depleted marine mammal under the MMPA." Appellants' Br. 47. Had it been given notice, the Safari Club claims it "would have argued . . . that simply listing a species as threatened was not a 'designation' of a marine mammal as depleted." Appellants' Br. 49. The district court rejected this argument, finding that the proposed rule in fact "provided sufficient notice of the potential effects of the Listing Rule and of the polar bear's depleted status." *In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d at 255. Again, we agree.

The notice of proposed rulemaking clearly advised stakeholders that the ESA listing could have the effect of designating the polar bear as a depleted species within the meaning of the MMPA's import prohibitions. The proposed rule explained that:

> Regarding ongoing importation of polar bear trophies taken from approved populations in Canada into the United States, we anticipate conducting an evaluation of the merits of continuing the presently authorized imports. Under the MMPA Section 102—

Prohibitions [Importation of pregnant or nursing animals; depleted species which includes those listed as threatened or endangered under the ESA] it is unlawful to import into the United States any marine mammal if the mammal was taken from a species or population stock that the Secretary has, by regulation published in the Federal Register, designated as a depleted species or stock.

*Proposed Rule to List the Polar Bear (Ursus maritimus) as Threatened Throughout Its Range*, 72 Fed. Reg. 1064, 1098 (Jan. 9, 2007) (bracketed text in original). In other words, the proposed rule not only explained the Service's view that "depleted species . . . include[] those listed as threatened or endangered under the ESA," but also alerted interested parties that the MMPA could therefore bar continued trophy importation. *Id.* Indeed, the Safari Club seems to have understood this: it submitted comments to the Service warning that "[l]isting under the ESA would make it impossible for U.S. citizens to import sport-hunted polar bear trophies into the United States, at least without the adoption of special rules and permits to allow such imports." Thus, the Safari Club "should have anticipated"—and did in fact anticipate—"the agency's final course in light of the initial notice," rendering the final rule a "logical outgrowth of its notice." *Covad Communications Co. v. FCC*, 450 F.3d 528, 548 (D.C. Cir. 2006) (internal quotation marks omitted).

## III.

For the foregoing reasons, we affirm.

*So ordered.*