# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 17, 2014        Decided March 21, 2014

No. 13-5270

NACS, FORMERLY KNOWN AS NATIONAL ASSOCIATION OF
CONVENIENCE STORES, ET AL.,
APPELLEES

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-02075)

———

*Katherine H. Wheatley*, Associate General Counsel, Board of Governors of the Federal Reserve System, argued the cause for appellant. With her on the briefs were *Richard M. Ashton*, Deputy General Counsel, *Yvonne F. Mizusawa*, Senior Counsel, and *Joshua P. Chadwick*, Counsel.

*Seth P. Waxman* argued the cause for *amici curiae* The Clearing House Association, L.L.C., et al. in support of neither party. With him on the brief were *Albinas Prizgintas*, *Noah A. Levine*, and *Alan Schoenfeld*.

*Shannen W. Coffin* argued the cause for appellees. With him on the brief was *Linda C. Bailey*.

*Andrew G. Celli Jr.*, *Ilann M. Maazel*, and *O. Andrew F. Wilson* were on the brief for *amicus curiae* The Retail Litigation Center, Inc. in support of appellees.

*Jeffrey I. Shinder* was on the brief for *amici curiae* 7-Eleven, Inc., et al. in support of appellees.

*David A. Balto* was on the brief for *amicus curiae* United States Senator Richard J. Durbin in support of appellees.

Before: TATEL, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Combining features of credit cards and checks, debit cards have become not just the most popular noncash payment method in the United States but also a source of substantial revenue for banks and companies like Visa and MasterCard that own and operate debit card networks. In 2009 alone, debit card holders used their cards 37.6 billion times, completing transactions worth over $1.4 trillion and yielding over $20 billion in fees for banks and networks. Concerned that these fees were excessive and that merchants, who pay the fees directly, and consumers, who pay a portion of the fees indirectly in the form of higher prices, lacked any ability to resist them, Congress included a provision in the Dodd-Frank financial reform act directing the Board of Governors of the Federal Reserve System to address this perceived market failure. In response, the Board issued regulations imposing a cap on the per-transaction fees banks receive and, in an effort to force

networks to compete for merchants' business, requiring that at least two networks owned and operated by different companies be able to process transactions on each debit card. Merchant groups challenged the regulations, seeking lower fees and even more network competition. The district court granted summary judgment to the merchants, concluding that the rules violate the statute's plain language. We disagree. Applying traditional tools of statutory interpretation, we hold that the Board's rules generally rest on reasonable constructions of the statute, though we remand one minor issue—the Board's treatment of so-called transactions-monitoring costs—to the Board for further explanation.

## I.

Understanding this case requires looking under the hood—or, more accurately, behind the teller's window—to see what really happens when customers use their debit cards. After providing some background about debit cards and the debit card marketplace, we outline Congress's effort to solve several perceived market failures, the Board's attempt to put Congress's directives into action, and the district court's rejection of the Board's approach.

## A.

We start with the basics. For purposes of this case, the term "debit card" describes both traditional debit cards, which allow cardholders to deduct money directly from their bank accounts, and prepaid cards, which come loaded with a certain amount of money that cardholders can spend down and, in some cases, replenish. Debit card transactions are typically processed using what is often called a "four party system." The four parties are the cardholder who makes the purchase, the merchant who accepts the debit card payment, the cardholder's bank (called the "issuer" because it issues the debit card to the cardholder), and

the merchant's bank (called the "acquirer" because it acquires funds from the cardholder and deposits those funds in the merchant's account). In addition, each debit transaction is processed on a particular debit card "network," often affiliated with MasterCard or Visa. The network transmits information between the cardholder/issuer side of the transaction and the merchant/acquirer side. Issuers activate certain networks on debit cards, and only activated networks can process transactions on those cards.

Virtually all debit card transactions fall into one of two categories: personal identification number (PIN) or signature. PIN and signature transactions employ different methods of "authentication"—a process that establishes that the cardholder, and not a thief, has actually initiated the transaction. In PIN authentication, the cardholder usually enters her PIN into a terminal. In signature authentication, the cardholder usually signs a copy of the receipt. Most networks can process either PIN transactions or signature transactions, but not both. Signature networks employ infrastructure used to process credit card payments, while PIN networks employ infrastructure used by ATMs. Only about one-quarter of merchants currently accept PIN debit. Some merchants have never acquired the terminals needed for customers to enter their PINs, while others believe that signature debit better suits their business needs. More about this later. And merchants who sell online generally refuse to accept PIN debit because customers worry about providing PINs over the Internet. Merchants who do accept both PIN and signature debit often allow customers to select whether to process particular transactions on a PIN network or a signature network.

Whether PIN or signature, a debit card transaction is processed in three stages: authorization, clearance, and

settlement. Authorization begins when the cardholder swipes her debit card, which sends an electronic "authorization request" to the acquirer conveying the cardholder's account information and the transaction's value. The acquirer then forwards that request along the network to the issuer. Once the issuer has determined whether the cardholder has sufficient funds in her account to complete the transaction and whether the transaction appears fraudulent, it sends a response to the merchant along the network approving or rejecting the transaction. Even if the issuer approves the transaction, that transaction still must be cleared and settled before any money changes hands.

Clearance constitutes a formal request for payment sent from the merchant on the network to the issuer. PIN transactions are authorized and cleared simultaneously: because the cardholder generally enters her PIN immediately after swiping her card, the authorization request doubles as the clearance message. Signature transactions are first authorized and subsequently cleared: because the cardholder generally signs only after the issuer has approved the transaction, the merchant must send a separate clearance message. This difference between PIN and signature processing explains why certain businesses, including car rental companies, hotels, and sit-down restaurants, often refuse to accept PIN debit. Car rental companies authorize transactions at pick-up to ensure that customers have enough money in their accounts to pay but postpone clearance to allow for the possibility that the customer might damage the vehicle or return it without a full tank of gas. Hotels authorize transactions at check-in but postpone clearance to allow for the possibility that the guest might trash the room, order room service, or abscond with the towels and robes. And sit-down restaurants authorize transactions for the full amount of the meal but postpone clearance to give diners an opportunity to add a tip.

The final debit card payment processing step, settlement, involves the actual transfer of funds from the issuer to the acquirer. After settlement, the cardholder's account has been debited, the merchant's account has been credited, and the transaction has concluded. Rather than settle transactions one-by-one, banks generally employ companies that determine each bank's net debtor/creditor position over a large number of transactions and then settle those transactions simultaneously.

Along the way, and central to this case, the parties charge each other various fees. The issuer charges the acquirer an "interchange fee," sometimes called a "swipe fee," which compensates the issuer for its role in processing the transaction. The network charges both the issuer and the acquirer "network processing fees," otherwise known as "switch fees," which compensate the network for its role in processing the transaction. Finally, the acquirer charges the merchant a "merchant discount," the difference between the transaction's face value and the amount the acquirer actually credits the merchant's account. Because the merchant discount includes the full value of the interchange fee, the acquirer's portion of the network processing fee, other acquirer and network costs, and a markup, merchants end up paying most of the costs acquirers and issuers incur. Merchants in turn pass some of these costs along to consumers in the form of higher prices. In contrast to credit card fees, which generally represent a set percentage of the value of a transaction, debit card fees change little as price increases. Thus, a bookstore might pay the same fees to sell a $25 hardcover that Mercedes would pay to sell a $75,000 car.

Before the Board promulgated the rules challenged in this case, networks and issuers took advantage of three quirks in the debit card market to increase fees without losing much business. First, issuers had complete discretion to decide whether to

activate certain networks on their cards. For instance, an issuer could limit payment processing to one Visa signature network, a Visa signature network and a Visa PIN network, or Visa and MasterCard signature and PIN networks. Second, networks had complete discretion to set the level of interchange and network processing fees. Finally, Visa and MasterCard controlled most of the debit card market. According to one study entered into the record, in 2009 networks affiliated with Visa or MasterCard processed over eighty percent of all debit transactions. Steven C. Salop, et al., *Economic Analysis of Debit Card Regulation Under Section 920*, Paper for the Board of Governors of the Federal Reserve System 10 (Oct. 27, 2010). Making things worse for merchants, these companies imposed "Honor All Cards" rules that prohibited merchants from accepting some but not all of their credit cards and signature debit cards. Merchants were therefore stuck paying whatever fees Visa and MasterCard chose to set, unless they refused to accept any Visa and MasterCard credit and signature debit cards—hardly a realistic option for most merchants given the popularity of plastic.

Exercising this market power, issuers and networks often entered into mutually beneficial agreements under which issuers required merchants to route transactions on certain networks that generally charged high processing fees so long as those networks also set high interchange fees. Many of these agreements were exclusive, meaning that issuers agreed to activate only one network or only networks affiliated with one company. Networks and issuers also negotiated routing priority agreements, which forced merchants to process transactions on certain activated networks rather than others. By 2009, interchange and network processing fees had reached, on average, 55.5 cents per transaction, including a 44 cent interchange fee, a 6.5 cent network processing fee charged to the issuer, and a 5 cent network processing fee charged to the

acquirer. Debit Card Interchange Fees and Routing, Notice of Proposed Rulemaking ("NPRM"), 75 Fed. Reg. 81,722, 81,725 (Dec. 28, 2010).

**B.**

Seeking to correct the market defects that were contributing to high and escalating fees, Congress passed the Durbin Amendment as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). The amendment, which modified the Electronic Funds Transfer Act (EFTA), Pub. L. No. 95-630, 92 Stat. 3641 (1978), contains two key provisions. The first, EFTA section 920(a), restricts the amount of the interchange fee. Specifically, it instructs the Board of Governors of the Federal Reserve System to promulgate regulations ensuring that "the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3)(A); *see also id.* § 1693o-2(a)(6)–(7)(A) (exempting debit cards issued by banks that, combined with all affiliates, have assets of less than $10 billion and debit cards affiliated with certain government payment programs from interchange fee regulations). To this end, section 920(a)(4)(B), in language the parties hotly debate, requires the Board to "distinguish between . . . the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular debit transaction, which cost shall be considered . . . , [and] other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered." *Id.* § 1693o-2(a)(4)(B)(i)-(ii). Like the parties, we shall refer to the costs of "authorization, clearance, and settlement" as "ACS costs." In addition, section 920(a) "allow[s] for an adjustment to the fee amount received or charged by an issuer" to compensate for "costs incurred by the issuer in

preventing fraud in relation to electronic debit transactions involving that issuer," so long as the issuer "complies with the fraud-related standards established by the Board." *Id.* § 1693o-2(a)(5)(A).

The second key provision, EFTA section 920(b), prohibits certain exclusivity and routing priority agreements. Specifically, it instructs the Board to promulgate regulations preventing any "issuer or payment card network" from "restrict[ing] the number of payment card networks on which an electronic debit transaction may be processed to . . . 1 such network; or . . . 2 or more [affiliated networks]." *Id.* § 1693o-2(b)(1)(A). It also directs the Board to prescribe regulations that prohibit issuers and networks from "inhibit[ing] the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions." *Id.* § 1693o-2(b)(1)(B). Congress anticipated that these prohibitions would force networks to compete for merchants' business, thus driving down fees.

## C.

In late 2010, the Board proposed rules to implement sections 920(a) and (b). As for section 920(a), the Board proposed allowing issuers to recover only "incremental" ACS costs and interpreted "incremental" ACS costs to mean costs that "vary with the number of transactions" an issuer processes over the course of a year. NPRM, 75 Fed. Reg. at 81,735. Issuers would thus be unable to recover "costs that are common to all debit card transactions and could never be attributed to any *particular* transaction (*i.e.*, fixed costs), even if those costs are specific to debit card transactions as a whole." *Id.* at 81,736. The Board "recognize[d]" that this definition would "impose[] a burden on issuers by requiring issuers to segregate costs that

vary with the number of transactions from those that are largely invariant to the number of transactions" and "that excluding fixed costs may prevent issuers from recovering through interchange fees some costs associated with debit card transactions." *Id*. The Board nonetheless determined that other definitions of "incremental cost" "do not appropriately reflect the incremental cost of a particular transaction to which the statute refers." *Id.* at 81,735. Limiting the interchange fee to average variable ACS costs, the Board proposed allowing issuers to recover at most 12 cents per transaction—considerably less than the 44 cents issuers had previously received on average. *Id.* at 81,736–39.

After evaluating thousands of comments, the Board issued a Final Rule that almost doubled the proposed cap. The Board abandoned its proposal to define "incremental" ACS costs to mean average variable ACS costs, deciding instead not to define the term "incremental costs" at all. Debit Card Interchange Fees and Routing, Final Rule ("Final Rule"), 76 Fed. Reg. 43,394, 43,426–27 (July 20, 2011). Observing that "the requirement that one set of costs be considered and another set of costs be excluded suggests that Congress left to the implementing agency discretion to consider costs that fall into neither category to the extent necessary and appropriate to fulfill the purposes of the statute," the Board allowed issuers to recover all costs "other than prohibited costs." *Id*. Thus, in addition to average variable ACS costs, issuers could recover: (1) what the proposed rule had referred to as "fixed" ACS costs; (2) costs issuers incur as a result of transactions-monitoring to prevent fraud; (3) fraud losses, which are costs issuers incur as a result of settling fraudulent transactions; and (4) network processing fees. *Id.* at 43,429–31. The Board prohibited issuers from recovering other costs, such as corporate overhead and debit card production and delivery costs, that the Board determined were not incurred to

process specific transactions. *Id.* at 43,427–29. Accounting for all permissible costs, the Board raised the interchange fee cap to 21 cents plus an *ad valorem* component of 5 basis points (.05 percent of a transaction's value) to compensate issuers for fraud losses. *Id.* at 43,404.

In response to section 920(b), the Board's proposed rule outlined two possible approaches. Under "Alternative A," issuers would have to activate at least two unaffiliated networks on each debit card regardless of method of authentication. NPRM, 75 Fed. Reg. at 81,749. For example, an issuer could activate a Visa signature network and a MasterCard PIN network. Under "Alternative B," issuers would have to activate at least two unaffiliated networks for each method of authentication. *Id.* at 81,749–50. For example, an issuer could activate both Visa and MasterCard signature *and* PIN networks.

In the Final Rule the Board chose Alternative A. Acknowledging that "Alternative A provides merchants fewer routing options," the Board reasoned that it satisfied statutory requirements and advanced Congress's desire to enhance competition among networks without excessively undermining the ability of cardholders to route transactions on their preferred networks or "potentially limit[ing] the development and introduction of new authentication methods." Final Rule, 76 Fed. Reg. at 43,448.

**D.**

Upset that the Board had nearly doubled the interchange fee cap (as compared to the proposed rule) and had selected the less restrictive anti-exclusivity option, several merchant groups, including NACS, the organization formerly known as the National Association of Convenience Stores, filed suit in district court. The merchants argued that both rules violate the plain

terms of the Durbin Amendment: the interchange fee cap because the statute allows issuers to recover only average variable ACS costs, not "fixed" ACS costs, transactions-monitoring costs, fraud losses, or network processing fees; and the anti-exclusivity rule because the statute requires that all merchants—even those who refuse to accept PIN debit—be able to route each debit transaction on multiple unaffiliated networks. Several financial services industry groups, which during rulemaking had urged the Board to set an even higher interchange fee cap and adopt an even less restrictive anti-exclusivity rule, participated as *amici curiae* in support of neither party.

The district court granted summary judgment to the merchants. The court began by observing that "[a]ccording to the Board, [the statute contains] ambiguity that the Board has discretion to resolve. How convenient." *NACS v. Board of Governors of the Federal Reserve System*, 958 F. Supp. 2d 85, 101 (D.D.C. 2013). Rejecting this view, the district court determined that the Durbin Amendment is "clear with regard to what costs the Board may consider in setting the interchange fee standard: Incremental ACS costs of individual transactions incurred by issuers may be considered. That's it!" *Id.* at 105. The district court thus concluded that the Board had erred in allowing issuers to recover "fixed" ACS costs, transactions-monitoring costs, fraud losses, and network processing fees. *Id.* at 105–09. The court also agreed with the merchants that section 920(b) unambiguously requires that all merchants be able to route every transaction on at least two unaffiliated networks. *Id.* at 109–14. The Board's final anti-exclusivity rule, the district court held, "not only fails to carry out Congress's intention; it effectively countermands it!" *Id.* at 112. Concluding that "the Board completely misunderstood the Durbin Amendment's statutory directive and interpreted the law in ways that were

clearly foreclosed by Congress," the district court vacated and remanded both the interchange fee rule and the anti-exclusivity rule. *Id.* at 114. But because regulated parties had already "made extensive commitments" in reliance on the Board's rules, the district court stayed vacatur to provide the Board a short period of time in which to promulgate new rules consistent with the statute. *Id.* at 115. Subsequently, the district court granted a stay pending appeal.

The Board now appeals, arguing that both rules rest on reasonable constructions of ambiguous statutory language. Financial services *amici*, urging reversal but still ostensibly appearing in support of neither party, filed a brief and participated in oral argument—though we have considered only those arguments that at least one party has not disavowed. *See Eldred v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001) (noting that arguments "rejected by the actual parties to this case" are "not properly before us"); *Eldred v. Ashcroft*, 255 F.3d 849, 854 (D.C. Cir. 2001) (Sentelle, J., dissenting from denial of rehearing en banc) ("Under the panel's holding, it is now the law of this circuit that *amici* are precluded *both* from raising new issues *and* from raising new arguments."). In a case like this, "in which the District Court reviewed an agency action under the [Administrative Procedures Act], we review the administrative action directly, according no particular deference to the judgment of the District Court." *In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litigation*, 720 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks omitted). Because the Board has sole discretion to administer the Durbin Amendment, we apply the familiar two-step framework set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). At *Chevron*'s first step, we consider whether, as the district court concluded, Congress has "directly spoken to the precise question at issue." *Id.* at 842. If not, we

proceed to *Chevron*'s second step where we determine whether the Board's rules rest on "reasonable" interpretations of the Durbin Amendment. *Id.* at 844.

Before addressing the parties' arguments, we think it worth emphasizing that Congress put the Board, the district court, and us in a real bind. Perhaps unsurprising given that the Durbin Amendment was crafted in conference committee at the eleventh hour, its language is confusing and its structure convoluted. But because neither agencies nor courts have authority to disregard the demands of even poorly drafted legislation, we must do our best to discern Congress's intent and to determine whether the Board's regulations are faithful to it.

## II.

We begin with the interchange fee. Recall that section 920(a)(4)(B)(i) *requires* the Board to include "incremental cost[s] incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction," and that section 920(a)(4)(B)(ii) *prohibits* the Board from including "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." Echoing the district court, the merchants argue that the two sections unambiguously permit issuers to recover only "incremental" ACS costs. "The plain language of the Durbin Amendment," the merchants insist, "does not grant the Board the discretion it claims to consider costs beyond those delineated in Section 920(a)(4)(B)." Appellees' Br. 26; *see also NACS*, 958 F. Supp. 2d at 100 (noting that the district court had "*no* difficulty concluding that the statutory language evidences an intent by Congress to bifurcate the entire universe of costs associated with interchange fees"). Alternatively, the merchants briefly argue that even if section 920(a)(4)(B) is ambiguous, the Board's resolution of that ambiguity was unreasonable—though

they acknowledge that this argument essentially rehashes their *Chevron* step one argument. *See* Appellees' Br. 44 ("Many of the same arguments discussed above also demonstrate the unreasonableness of the interchange fee standard."). The Board also thinks the Durbin Amendment is unambiguous, though it argues that the statute clearly establishes a third category of costs: those that are not "incremental" ACS costs but are specific to a particular transaction. *See* Final Rule, 76 Fed. Reg. at 43,426 ("[T]here exist costs that are not encompassed in either the set of costs the Board must consider under Section 920(a)(4)(B)(i), or the set of costs the Board may not consider under Section 920(a)(4)(B)(ii)."). Relying on the requirement that the interchange transaction fee be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction," 15 U.S.C. § 1693o-2(a)(2), (a)(3)(A), the Board concludes that it may but need not allow issuers to recover costs falling within this third category, subject of course to other statutory constraints. Like the merchants, the Board also offers a *Chevron* step two argument. *See* Appellant's Br. 71 ("Even assuming for the sake of argument that the district court offered a possible reading, the statute does not unambiguously foreclose the Board's construction . . . .").

The parties' competing arguments present us with two options. Were we to agree with the merchants that the statute allows recovery only of "incremental" ACS costs, we would have to invalidate the rule without considering the particular categories of costs the merchants challenge given that the Board expressly declined to define the ambiguous statutory term "incremental," let alone determine whether those particular types of costs qualify as "incremental" ACS costs. *See Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action

was based."). Were we to determine that the Board's reading of section 920(a)(4)(B) is either compelled by the statute or reasonable, we would have to go on to consider whether the statute allows recovery of "fixed" ACS costs, transactions-monitoring costs, fraud losses, and network processing fees. We must therefore first decide whether section 920(a)(4)(B) bifurcates the entire universe of costs the Board may consider, or whether the statute allows for the existence of a third category of costs that falls outside the two categories specifically listed.

## A.

The Board may well have been able to interpret section 920(a)(4)(B) as the merchants urge. Such a reading could rely on the statutory mandate to "distinguish between" one set of costs and "other costs," and could interpret section 920(a)(4)(B)(i) as referring to variable costs and section 920(a)(4)(B)(ii) as referring to fixed costs. But contrary to the merchants' position, and consistent with the Board's *Chevron* step two argument, we certainly see nothing in the statute's language compelling that result. The merchants' preferred reading requires assuming that the phrase "incremental cost incurred by the issuer for the role of the issuer in the authorization, clearance, and settlement of a particular electronic debit transaction" describes all issuer costs "specific to a particular electronic debit transaction." For several reasons, however, we believe that phrase could just as easily, if not more easily, be read to qualify the language of section 920(a)(4)(B)(i) such that it encompasses a subset of costs specific to a particular transaction, leaving other costs specific to a particular transaction unmentioned.

To begin with, as the Board pointed out in the Final Rule, the phrase "incremental cost" has a several possible definitions, including marginal cost, variable cost, "the cost of producing some increment of output greater than a single unit but less than

the entire production run," and "the difference between the cost incurred by a firm if it produces a particular quantity of a good and the cost incurred by the firm if it does not produce the good at all." Final Rule, 76 Fed. Reg. at 43,426–27. As a result, depending on how these terms are defined, the category of "incremental" costs would not necessarily encompass all costs that are "specific to a particular electronic debit transaction." *See infra* at 26 (noting the parties' agreement that the "specific to a particular electronic debit transaction" phrase should not be read to limit issuers to recovering only the marginal cost of each particular transaction).

Second, the phrase "incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" limits the class of "incremental" costs the Board must consider. So even if the word "incremental" were read to include all costs specific to a particular transaction, Congress left unmentioned incremental costs other than incremental ACS costs. *See* Final Rule, 76 Fed. Reg. at 43,426 n.116 ("The reference in Section 920(a)(4)(B)(i) requiring consideration of the incremental costs incurred in the 'authorization, clearance, or settlement of a particular transaction' and the reference in section 920(a)(4)(B)(ii) prohibiting consideration of costs that are 'not specific to a particular electronic debit transaction,' read together, recognize that there may be costs that are specific to a particular electronic debit transaction that are not incurred in the authorization, clearance, or settlement of that transaction."). For example, in the proposed rule the Board determined that "cardholder rewards that are paid by the issuer to the cardholder for each transaction" and "costs associated with providing customer service to cardholders for particular transactions" are "associated with a particular transaction" but "are not incurred by the issuer for its role in authorization, clearing, and settlement of that

transaction." NPRM, 75 Fed. Reg. at 81,735. Moreover, in the Final Rule the Board explained that fraud losses "are specific to a particular transaction" because they result from the settlement of particular fraudulent transactions, but are not incurred by the issuer for the role of the issuer in the authorization, clearance, or settlement of particular transactions. Final Rule, 76 Fed. Reg. at 43,431 (describing fraud losses as "the result of an issuer's authorization, clearance, or settlement of a particular electronic debit transaction that the cardholder later identifies as fraudulent"); *see also* Appellant's Br. 67 (defending the Board's decision to allow issuers to recover some fraud losses on the ground that fraud losses fall outside section 920(a)(4)(B)).

Third, as the Board pointed out, had Congress wanted to allow issuers to recover only incremental ACS costs, it could have done so directly. *See* Final Rule, 76 Fed. Reg. at 43,426. For instance, in section 920(a)(3)(A) Congress could have instructed the Board to "promulgate regulations ensuring that interchange fees are reasonable and proportional to the incremental costs of authorization, clearance, and settlement that an issuer incurs with respect to a particular electronic debit transaction." Instead, in section 920(a)(3)(A) Congress required the Board to promulgate regulations ensuring that interchange fees are "reasonable and proportional to the cost incurred by the issuer with respect to the transaction" and separately instructed the Board, when determining issuer costs, to "distinguish between" incremental ACS costs, which the Board must consider, 15 U.S.C. § 1693o-2(a)(4)(B)(i), and "other costs . . . which are not specific to a particular electronic debit transaction," which the Board must not consider, *id.* § 1693o-2(a)(4)(B)(ii).

The merchants advance several arguments in support of the opposite conclusion. They first assert that the "which" clause in

the phrase "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" should be read descriptively rather than restrictively. As their labels suggest, descriptive clauses explain, while restrictive clauses define. To illustrate, consider a simple sentence: "the cars which are blue have sunroofs." Read descriptively, the clause "which are blue" states a fact about the entire class of cars, which also happen to have sunroofs. Read restrictively, the clause defines a particular class of cars—blue cars—all of which have sunroofs. Although often subtle, the distinction between descriptive and restrictive clauses makes all the difference in this case. Here's why.

We have thus far assumed that section 920(a)(4)(B)(ii)'s "which" clause should be read restrictively. On this reading (the Board's), the clause defines the class of "other costs" issuers are precluded from recovering. As explained above, based on this restrictive reading the Board reasonably concluded that the statute establishes three categories of costs. But if the clause should instead be read descriptively, then it would describe a characteristic of "other costs" without limiting the meaning of "other costs." On this reading (the merchants'), the statute bifurcates the entire universe of costs, requiring the Board to define the statutory term "incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" as including all costs other than costs "not specific to a particular electronic debit transaction."

Normally, writers distinguish between descriptive and restrictive clauses by setting the former but not the latter aside with commas and by introducing the former with "which" and the latter with "that." Here, Congress introduced the clause at issue with the word "which" but failed to set it aside with

commas. Word choice thus suggests a descriptive reading of the clause, while punctuation suggests a restrictive reading. In support of a descriptive reading, the merchants rely on a ninety-year-old Supreme Court case for the proposition that "[p]unctuation is a minor, and not a controlling, element in interpretation." *Barrett v. Van Pelt*, 268 U.S. 86, 91 (1925); *see also NACS*, 958 F. Supp. 2d at 102 (calling Congress's failure to use commas a "red herring"). This decision provides the merchants little help. Not only was it written long before the development of modern approaches to statutory interpretation, *see U.S. National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439, 454–55 (1993) (noting that although reliance on punctuation must not "distort[] a statute's true meaning," "[a] statute's plain meaning must be enforced, of course, and the meaning of a statute will typically heed the commands of its punctuation"), but it addressed statutory language that, unlike here, contained a clearly misplaced comma, *Barrett*, 268 U.S. at 88 (interpreting a statute "so inapt and defective that it is difficult to give it a construction that is wholly satisfactory" without ignoring its comma).

The idea that we should entirely ignore punctuation would make English teachers cringe. Even if punctuation is sometimes a minor element in interpreting the meaning of language, punctuation is often crucial—a reader might appropriately gloss over a comma mistakenly inserted between a noun and a verb yet pay extra attention to a comma or semicolon setting off separate items in a list. Following the merchants' advice and stuffing punctuation to the bottom of the interpretive toolbox would run the risk of distorting the meaning of statutory language. After all, Congress communicates through written language, and one component of written language is grammar, including punctuation. As *Strunk and White* puts it, "the best writers sometimes disregard the rules of rhetoric. When they do

so, however, the reader will usually find in the sentence some compensating merit, attained at the cost of the violation. Unless he is certain of doing as well, he will probably do best to follow the rules." WILLIAM STRUNK, JR. & E.B. WHITE, THE ELEMENTS OF STYLE xvii–xviii (4th ed. 2000) (internal quotation marks omitted). Put another way, "all our thoughts can be rendered with absolute clarity if we bother to put the right dots and squiggles between the words in the right places." LYNN TRUSS, EATS, SHOOTS & LEAVES 201–02 (2003).

In this instance, the absence of commas matters far more than Congress's use of the word "which" rather than "that." Widely-respected style guides expressly require that commas set off descriptive clauses, but refer to descriptive "which" and restrictive "that" as a style preference rather than an ironclad grammatical rule. As *The Chicago Manual of Style* explains:

> A relative clause that is restrictive—that is, essential to the meaning of the sentence—is neither preceded nor followed by a comma. But a relative clause that could be omitted without essential loss of meaning (a nonrestrictive clause) should be both preceded and (if the sentence continues) followed by a comma. Although *which* can be used restrictively, many careful writers preserve the distinction between restrictive *that* (no commas) and descriptive *which* (commas).

THE CHICAGO MANUAL OF STYLE 250 (14th ed. 2003). *Compare* STRUNK & WHITE at 3–4 ("Nonrestrictive relative clauses are parenthetic. . . . Commas are therefore needed."), *and* WILSON FOLLETT, MODERN AMERICAN USAGE: A GUIDE 69 (Erik Wensberg ed., 1998) (same), *with* STRUNK & WHITE at 59 ("The use of *which* for *that* is common in written and spoken language. . . . Occasionally *which* seems preferable to *that* . . . But it would be a convenience to all if these two pronouns were used with

precision."), *and* FOLLETT at 293 ("The alert reader will notice that quite a few excellent authors decline to use *that* and *which* in precisely the ways that late-twentieth-century grammar books recommend.").

In fact, elsewhere in the Durbin Amendment Congress demonstrated that it is among those writers who ignore the distinction between descriptive "which" and restrictive "that." In section 920(b)(1)(A), for example, Congress instructed the Board to prevent networks and issuers from activating on a debit card only one network or "2 or more such networks *which* are owned, controlled, or otherwise operated by" the same company. 15 U.S.C. § 1693o-2(b)(1)(A)(i)-(ii) (emphasis added). Even though Congress used the word "which" to introduce this clause, the clause is clearly restrictive. A descriptive reading would require that the Board prevent issuers and networks from ever activating "one network" or "2 or more such networks." In other words, a descriptive reading would prevent the activation of any networks at all, rendering debit cards useless chunks of plastic. *Cf. Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (finding a restrictive clause in the statutory phrase "any other kind of substantial gainful work which exists in the national economy"). By contrast, in the Durbin Amendment Congress set aside every clearly descriptive clause with commas. *See, e.g.*, 15 U.S.C. § 1693o-2(a)(4)(B)(ii) ("other costs incurred by an issuer which are not specific to a particular electronic debit transaction*, which* costs shall not be considered under paragraph (2)" (emphasis added)).

The merchants also emphasize Congress's use of the terms "distinguish between," 15 U.S.C. § 1693o-2(a)(4)(B), and "other costs," *id.* § 1693o-2(a)(4)(B)(ii). According to the merchants, the term "distinguish between" suggests that Congress required the Board to "differentiate [between] the two categories of

costs," and "the very use of the term 'other costs'—as opposed to simply 'costs'—indicates the entire universe of costs that is remaining after consideration of includable costs." Appellees' Br. 28. As noted above, these terms might provide some textual support for the merchants' preferred reading of the statute. But given the Board's reasonable determination that issuers incur costs, other than incremental ACS costs, that are "specific to a particular transaction," the terms "distinguish between" and "other costs" hardly compel the conclusion that the Board must interpret section 920(a)(4)(B) as encompassing all costs that issuers incur. Imagine that you make a deal to hand over part of your baseball card collection and to distinguish between rookie cards, which you must hand over, and other cards less than five years old, which you must not. Although it would probably make little financial sense, you could certainly hand over a 1960 Harmon Killebrew Topps card without violating the terms of the deal.

Next, the merchants assert that the Board, by inferring the existence of a third category of costs, improperly reads a delegation of authority into congressional silence. According to the merchants, "Congress would not delineate with specificity the characteristics of includable costs (*e.g.*, incremental) if it intended, by its silence, to allow the Board to consider and include *their opposite* (*e.g.*, nonincremental)." Appellees' Br. 31; *accord American Petroleum Institute v. Environmental Protection Agency*, 198 F.3d 275, 278 (D.C. Cir. 2000) ("[I]f Congress makes an explicit provision for apples, oranges and bananas, it is most unlikely to have meant grapefruit."). But section 920(a)(3)(A) clearly grants the Board authority to promulgate regulations ensuring that interchange fees are reasonable and proportional to costs issuers incur. The question then is how section 920(a)(4)(B) limits the Board's discretion to define the statutory term "cost incurred by the issuer with

respect to the transaction," not whether that section affirmatively grants the Board authority to allow issuers to recover certain costs.

Finally, in a footnote the merchants point to section 920(a)(3)(B)'s requirement that the Board disclose certain ACS cost information and to section 920(a)(4)(A)'s requirement that the Board "consider the functional similarity between electronic debit transactions and checking transactions that are required within the Federal Reserve bank system to clear at par." The district court relied heavily on these provisions, concluding that Congress's decisions to limit disclosure "to the same costs specified in section (a)(4)(B)(i)" and to direct the Board to consider similarities, but not differences, between checks and debit cards support the merchants' interpretation of the statute. *NACS*, 958 F. Supp. 2d at 103–04. But even assuming the disclosure provision mirrors section 920(a)(4)(B)(i)'s reference to incremental ACS costs—the word "incremental" appears nowhere in the disclosure provision—the statute also allows the Board to collect "such information as may be necessary to carry out the provisions of this section," not just information about incremental ACS costs. 15 U.S.C. § 1693o-2(a)(3)(B). Similarly, Congress's instruction to the Board to "consider the functional similarity between electronic debit transactions and checking transactions" hardly precludes the Board from considering differences as well. Doing just that, the Board decided that it could allow banks to recover some costs in the debit card context that they are unable to recover in the checking context.

Given the Durbin Amendment's ambiguity as to the existence of a third category of costs, we must defer to the Board's reasonable determination that the statute splits costs into three categories: (1) incremental ACS costs, which the Board must allow issuers to recover; (2) costs specific to a particular

transaction, other than incremental ACS costs, which the Board may, but need not, allow issuers to recover; and (3) costs not specific to a particular transaction, which the Board may not allow issuers to recover. *See Chevron*, 467 U.S. at 843 ("Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").

**B.**

Because the Board reasonably interpreted the Durbin Amendment as allowing issuers to recover some costs in addition to incremental ACS costs, we must now determine whether the Board reasonably concluded that issuers can recover the four specific types of costs the merchants challenge: "fixed" ACS costs, network processing fees, fraud losses, and transactions-monitoring costs. Much like agency ratemaking, determining whether issuers or merchants should bear certain costs is "far from an exact science and involves policy determinations in which the [Board] is acknowledged to have expertise." *Time Warner Entertainment Co. v. Federal Communications Commission*, 56 F.3d 151, 163 (D.C. Cir. 1995) (internal quotation marks omitted). We afford agencies special deference when they make these sorts of determinations. *See, e.g.*, *BNSF Railway Co. v. Surface Transportation Board*, 526 F.3d 770, 774 (D.C. Cir. 2008) ("In the rate-making area, our review is particularly deferential, as the Board is the expert body Congress has designated to weigh the many factors at issue when assessing whether a rate is just and reasonable."); *Time Warner*, 56 F.3d at 163. With that caution in mind, we address each category of costs.

"Fixed" ACS Costs

Microeconomics textbooks draw a clear distinction between "fixed" and "variable" costs: fixed costs are incurred regardless of transaction volume, whereas variable costs change as transaction volume increases. *E.g.*, N. GREGORY MANKIW, PRINCIPLES OF MICROECONOMICS 276–77 (3d ed. 2004). The merchants, noting that the statute precludes recovery of costs "not specific to a particular . . . transaction," 15 U.S.C. § 1693o-2(a)(4)(B)(ii), argue that the Board's Final Rule improperly allows recovery of fixed costs such as "equipment, hardware and software." Appellees' Br. 35. "By definition," the merchants declare, "fixed costs are not 'specific' to any 'particular' transaction and fall squarely within the statute's excludable costs provision." *Id.* at 39. The merchants therefore urge us to require the Board to return to something along the lines of its proposed rule, under which merchants could only recover average variable ACS costs.

The merchants' argument certainly has some persuasive power. One might think it a stretch if a shoe store claimed that the rent it pays its landlord is somehow "specific" to a "particular" shoe sale. But the merchants have never argued that issuers should be allowed to recover only costs incurred as a result of processing individual, isolated transactions. *See* NPRM, 75 Fed. Reg. at 81,736 (requesting comment about whether "costs should be limited to the marginal cost of a transaction"); Final Rule, 76 Fed. Reg. at 43,427 n.118 (noting that "[t]he Board did not receive comments regarding the use of marginal cost"). Indeed, the Board's proposed rule, which the merchants seem to endorse, would have allowed recovery of costs that are variable over the course of a year but could not be traced to any one particular transaction.

We think the Board reasonably declined to read section 920(a)(4)(B) as preventing issuers from recovering "fixed" costs. As the Board pointed out, the distinction the merchants urge between what they refer to as non-includable "fixed" costs and includable "variable" costs depends entirely on whether, on an issuer-by-issuer basis, certain costs happen to vary based on transaction volume in a particular year. For example, in any given year one issuer might classify labor as an includable cost because labor costs happened to vary based on transaction volume over that year, while another issuer might classify labor as a non-includable cost because such costs happened to remain fixed over that year. *See* Final Rule, 76 Fed. Reg. at 43,427. Moreover, the Board pointed out, the distinction between variable and fixed ACS costs depends in some instances on whether an issuer "performs its transactions processing in-house" or "outsource[s] its debit card operations to a third-party processor that charge[s] issuers a per-transaction fee based on its entire cost." *Id.* In any event, the Board concluded, requiring issuers to segregate includable "variable" costs from excludable "fixed" costs on a year-by-year basis would prove "exceedingly difficult for issuers . . . [because] even if a clear line could be drawn between an issuer's costs that are variable and those that are fixed, issuers' cost-accounting systems are not generally set up to differentiate between fixed and variable costs." *Id.* The Board therefore determined that any distinction between fixed and variable costs would prove artificial and unworkable.

Instead, pointing out that the statute requires interchange fees to be "reasonable and proportional" to issuer costs, the Board interpreted section 920(a)(4)(B) as allowing issuers to recover costs they must incur in order to effectuate particular electronic debit card transactions but precluding them from recovering other costs too remote from the processing of actual transactions. "This reading interpret[s] costs that 'are not

specific to a particular electronic debit transaction,' and . . . cannot be considered by the Board, to mean those costs that are not incurred in the course of effecting any electronic debit transaction." *Id.* at 43,426. In our view, the Board reasonably distinguished between costs issuers could recover and those they could not recover on the basis of whether those costs are "incurred in the course of effecting" transactions. *Id.* For instance, the Board's rule allows issuers to recover equipment, hardware, software, and labor costs since "[e]ach transaction uses the equipment, hardware, software and associated labor, and no particular transaction can occur without incurring these costs." *Id.* at 43,430. By contrast, the rule precludes issuers from recovering the costs of producing and distributing debit cards because "an issuer's card production and delivery costs . . . are incurred without regard to whether, how often, or in what way an electronic debit transaction will occur." *Id.* at 43,428. Given the Board's expertise, we see no basis for upsetting its reasonable line-drawing. *See ExxonMobil Gas Marketing Co. v. Federal Energy Regulatory Commission*, 297 F.3d 1071, 1085 (D.C. Cir. 2002) ("We are generally unwilling to review line-drawing . . . unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem." (internal quotation marks omitted)).

Network Processing Fees

This is easy. Network processing fees, which issuers pay on a per-transaction basis, are obviously specific to particular transactions. The merchants argue that allowing issuers to recover network processing fees through the interchange fee would run afoul of section 920(a)(8)(B), which requires the Board to ensure that "a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic

debit transaction." Perhaps signaling that even the merchants are not entirely confident about this argument, they present it only in a footnote. The merchants should have left it out entirely. As the Board points out, section 920(a)(8)(B) is designed to prevent issuers and networks from circumventing the Board's interchange fee rules, not to prevent issuers from recovering reasonable network processing fees through the interchange fee. Final Rule, 76 Fed. Reg. at 43,442 ("[Section 920(a)(8)(B)] authorizes the Board to prescribe rules to prevent circumvention or evasion of the interchange transaction fee standards.").

Fraud Losses

The merchants nowhere challenge the Board's conclusion that fraud losses, which result from the settlement of particular fraudulent transactions, are specific to those transactions. The only question is whether a separate provision of the Durbin Amendment—section 920(a)(5)'s fraud-prevention adjustment, which allows issuers to recover fraud-prevention costs if those issuers comply with the Board's fraud-prevention standards— precludes the Board from allowing issuers to recover fraud losses as part of section 920(a)(2)'s "reasonable and proportional" interchange fee. The merchants claim that it does.

First, noting that Congress intended the fraud-prevention adjustment to be the only "fraud-related adjustment of the issuer," 15 U.S.C. § 1693o-2(a)(5)(A)(ii)(I), the merchants argue that the Board should have allowed issuers to recover fraud-related costs only through the fraud-prevention adjustment. We disagree. The Board determined—reasonably in our view—that because fraud losses result from the *failure* of fraud-prevention, they do not themselves qualify as fraud-prevention costs. *See* Final Rule, 76 Fed. Reg. at 43,431 ("An issuer may experience losses for fraud that it cannot prevent and cannot charge back to the acquirer or recoup from the cardholder."). And nothing in the

statute suggests that Congress used the word "adjustment" to describe the process of determining which costs issuers should be allowed to recover directly through the interchange fee. Rather, when discussing the fraud-prevention adjustment, Congress empowered the Board to "allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2)." 15 U.S.C. § 1693o-2(a)(5)(A). Paragraph (2), in turn, requires that the interchange fee be "reasonable and proportional" to costs incurred by issuers. *Id.* § 1693o-2(a)(2). Thus, Congress used the word "adjustment" to describe a bonus over and above the "reasonable and proportional" interchange fee.

The merchants next maintain that allowing issuers to recover fraud losses through the interchange fee "irrespective of any particular bank's efforts to reduce fraud" would undermine Congress's decision to condition receipt of the fraud-prevention adjustment on compliance with the Board's fraud-prevention standards. Appellees' Br. 43. Even assuming the merchants' policy argument has some merit—allowing recovery of fraud losses regardless of compliance with fraud-prevention standards might well decrease issuers' incentives to invest in fraud prevention—the Board rejected it, reasoning that "[i]ssuers will continue to bear the cost of some fraud losses and cardholders will continue to demand protection against fraud." Final Rule, 76 Fed. Reg. at 43,431. Such policy judgments are the province of the Board, not this Court. *See Village of Barrington, Illinois v. Surface Transportation Board*, 636 F.3d 650, 666 (D.C. Cir. 2011) ("As long as the agency stays within [Congress's] delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference." (internal quotation marks omitted) (alterations in original)).

Transactions-Monitoring Costs

The Board acknowledged in the Final Rule that transactions-monitoring costs, unlike fraud losses, are the paradigmatic example of fraud-prevention costs. Final Rule, 76 Fed. Reg. at 43,397 ("The most commonly reported fraud prevention activity was transaction monitoring."). The Board then distinguished between "[t]ransactions monitoring systems [that] assist in the authorization process by providing information to the issuer before the issuer decides to approve or decline the transaction," which the Board placed outside the fraud-prevention adjustment, and "fraud-prevention activities . . . that prevent fraud with respect to transactions at times other than when the issuer is effecting the transaction"—for instance the cost of sending "cardholder alerts . . . inquir[ing] about suspicious activity"—which the Board determined should be "considered in connection with the fraud-prevention adjustment." *Id.* at 43,430–31. Challenging this distinction, the merchants think it "preposterous to suggest that Congress would *specifically address* the costs associated with fraud prevention in a separate provision of the statute, condition the recovery of those costs on an issuer's compliance with fraud prevention measures, and then . . . permit recovery of those very same costs" whether or not an issuer complies with fraud-prevention standards. Appellees' Br. 41.

As an initial matter, we agree with the Board that transactions-monitoring costs can reasonably qualify both as costs "specific to a particular . . . transaction" (section 920(a)(4)(B)) and as fraud-prevention costs (section 920(a)(5)). Thus, the Board may have discretion either to allow issuers to recover transactions-monitoring costs through the interchange fee regardless of compliance with fraud-prevention standards or to preclude issuers from recovering transactions-monitoring

costs unless those issuers comply with fraud-prevention standards. That said, "an agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 48 (1983). We agree with the merchants that the Board has fallen short of that standard.

The Board insists that the distinction it drew between fraud-prevention costs falling outside the fraud-prevention adjustment and fraud-prevention costs falling within it reflects the distinction between, on the one hand, section 920(a)(4)(B)'s focus on a single transaction and, on the other, section 920(a)(5)(A)(i)'s focus on "electronic debit *transactions* involving that issuer." According to the Board, Congress "intended the . . . fraud-prevention adjustment to take into account an issuer's fraud prevention costs over a broad spectrum of transactions that are not linked to a particular transaction." Appellant's Br. 66–67. But as noted above, the Board interpreted the term "specific to a particular . . . transaction" as in fact allowing recovery of many costs not literally "specific" to any one "particular" transaction. *See supra* at 26–28. The costs of hardware, software, and labor seem no more "specific" to one "particular" transaction than many of the fraud-prevention costs the Board determined fall within the fraud prevention adjustment. The Board's own interpretation of the statute thus undermines its justification for concluding that Congress established a fraud-prevention adjustment, conditioned receipt of that adjustment on compliance with fraud-prevention standards, yet allowed issuers to recover the paradigmatic example of fraud-prevention costs—transactions-monitoring costs—whether or not issuers comply with those standards.

All that said, the Board may well be able to articulate a reasonable justification for determining that transactions-monitoring costs properly fall outside the fraud-prevention adjustment. But the Board has yet to do so. "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or *if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it,* the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphasis added). We shall do so here. Because the interchange fee rule generally rests on a reasonable interpretation of the statute, because the Board may well be able to articulate a sufficient explanation for its treatment of fraud-prevention costs, and because vacatur of the rule would be disruptive—the merchants seek an even lower interchange fee cap, but vacating the Board's rule would lead to an entirely unregulated market, allowing the average interchange fee to once again reach or exceed 44 cents per transaction—we see no need to vacate. *See Heartland Regional Medical Center v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (noting that remand without vacatur is warranted "[w]hen an agency may be able readily to cure a defect in its explanation of a decision" and the "disruptive effect of vacatur" is high); *see also, e.g.*, *Environmental Defense Fund v. Environmental Protection Agency*, 898 F.2d 183, 190 (D.C. Cir. 1990) (instructing that courts should ordinarily remand without vacatur when vacatur would "at least temporarily defeat" the interests of the party successfully seeking remand).

## III.

Having resolved the merchants' challenges to the interchange fee rule, we turn to the anti-exclusivity rule. As explained above, *see supra* at 9, section 920(b) requires the

Board to promulgate regulations preventing "an issuer or payment card network" from "restrict[ing] the number of payment card networks on which an electronic debit transaction may be processed" to a single network, or to networks affiliated with one another. In the proposed rule, the Board outlined two alternatives: require issuers and networks to activate two unaffiliated networks or two unaffiliated networks for each method of authentication. In the Final Rule, the Board chose the former, requiring activation of two unaffiliated networks on each debit card regardless of method of authentication.

The merchants believe that the Durbin Amendment unambiguously requires that all merchants have multiple unaffiliated network routing options for each debit transaction. *See NACS*, 958 F. Supp. 2d at 109–12 (accepting this argument). Arguing that the Board's rule flunks this requirement, the merchants emphasize two undisputed facts. First, given that most merchants refuse to accept PIN debit, many transactions can currently be processed only on signature debit. Second, cardholders, not merchants, often have the ability to select whether to process transactions on signature networks or PIN networks. As a result, the merchants emphasize, under the Board's rule many merchants will still lack the ability to choose between unaffiliated networks when deciding how to process particular transactions. Disputing none of this, the Board points out that all merchants *could* accept PIN debit even if some choose not to and emphasizes that the statute is silent about "restrictions imposed by merchants or consumers that limit routing choice." Appellant's Br. 22. Given the parties' agreement that under the Board's rule some merchants will lack routing choice for particular transactions, we must determine whether the statute requires that all merchants—even those who voluntarily choose not to accept PIN debit—have the ability to decide between unaffiliated networks when routing transactions.

The merchants have a steep hill to climb. Congress directed the Board to issue rules that would accomplish a particular objective, leaving it to the Board to decide how best to do so, and the Board's rule seems to comply perfectly with Congress's command. Under the rule, "issuer[s] and payment card network[s]" cannot "restrict the number of payment card networks on which an electronic debit transaction may be processed" to only affiliated networks—exactly what the statute requires. 15 U.S.C. § 1693o-2(b)(1)(A).

Undaunted, the merchants emphasize one largely conclusory textual argument and allude to another. First, relying on the statutory phrase "electronic debit transaction," *id.* § 1693o-2(b)(1)(A), they maintain that the statute plainly "requires the Board to ensure that merchants be afforded a choice of networks for *each debit transaction*." Appellees' Br. 45. But context matters. Relying on the statute's reference to "issuer[s] and payment card network[s]," the Board reasonably read the "electronic debit transactions" phrase to prevent issuers and networks, prior to instigation of any particular debit transaction, from limiting the number of networks "on which *an* electronic debit transaction *may* be processed" to only affiliated networks. 15 U.S.C. § 1693o-2(b)(1)(A) (emphasis added).

In a footnote, the merchants repeat, though they seem not to embrace, a textual argument on which the district court relied. Looking to the statutory definitions of "electronic debit transaction" ("a transaction in which a person uses a debit card") and of "debit card" ("any card . . . issued or approved for use through a payment card network to debit an asset account . . . whether authorization is based on signature, PIN, or other means"), *id.* § 1693o-2(c)(2), (c)(5), the district court ruled that the statutory term "electronic debit transaction" requires that issuers and networks activate multiple unaffiliated networks for

each transaction "whether authorization is based on signature, PIN, or other means," *NACS*, 958 F. Supp. 2d at 110–11. But we think it quite implausible that Congress engaged in a high-stakes game of hide-and-seek with the Board, writing a provision that seems to require one thing but embedding a substantially different and, according to financial services *amici*, much more costly requirement in the statute's definitions section. *Cf. Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001) ("Congress . . . does not . . . hide elephants in mouseholes.").

The merchants also argue that the Board's rule runs afoul of the Durbin Amendment's purpose. Pointing out that Congress intended network competition to drive down network processing fees, the merchants insist that the Board has undermined this competitive market because "merchants will be deprived of network choice for a substantial segment of debit transactions in the marketplace today." Appellees' Br. 47. But the Board thought differently. As it explained in the Final Rule, "merchants that currently accept PIN debit would have routing choice with respect to PIN debit transactions in many cases where an issuer chooses to participate in multiple PIN debit networks." Final Rule, 76 Fed. Reg. at 43,448. Indeed, the Board presents uncontested evidence demonstrating that its rule has, as predicted, substantially increased network competition. According to the Board, as a result of the rule over 100 million debit cards were activated on new networks, and "[Visa], which had previously accounted for approximately 50-60% of the [PIN debit] market, lost roughly half that share." Appellant's Br. 37 & n.6 (internal quotation marks omitted).

Of course, as the Board acknowledges, the merchants' preferred rule would result in *more* competition. But in its Final Rule the Board explained the policy considerations that led it to

reject that approach. For one thing, cardholders might prefer to route transactions over certain networks, perhaps because they believe those networks to have better fraud-prevention policies. Final Rule, 76 Fed. Reg. at 43,447–48. Also, the merchants' preferred rule "could potentially limit the development and introduction of new authentication methods" since issuers would be unable to compel merchants to accept new authentication techniques. Final Rule, 76 Fed. Reg. at 43,448. The merchants ignore these reasonable concerns. Given that the Board's rule advances the Durbin Amendment's purpose, we decline to second-guess its reasoned decision to reject an alternative option that might have further advanced that purpose.

Next, the merchants emphasize the interaction between section 920(b)'s two key components: the anti-exclusivity and routing priority provisions. According to the merchants, the Board's anti-exclusivity rule renders the routing priority provision meaningless, since merchants will often lack the ability to choose between multiple unaffiliated routing options. But as the Board points out, the merchants misunderstand the routing priority provision. Recall that it prohibits issuers and networks from requiring merchants to process transactions over certain activated networks rather than others. Far from rendering the routing priority provision a nullity, the Board's anti-exclusivity provision would be ineffective without it. Absent the routing priority provision, issuers and networks could, for instance, activate two PIN networks and a signature network affiliated with one of the PIN networks and then require merchants to route transactions over the PIN network affiliated with the signature network rather than over the other PIN network.

Finally, the merchants question the Board's premise that it is they, not issuers and networks, who restrict routing options for

transactions under the Board's Final Rule. To this end, they assert that issuer and network rules arbitrarily prevent merchants from processing PIN transactions on signature networks and vice versa, suggesting that the Board could comply with the statute by eliminating the distinction between PIN and signature debit. But even if issuers and networks are responsible for maintaining this distinction—a point they strongly dispute—merchants, not issuers or networks, limit their own options when they refuse to accept PIN debit, and cardholders, not issuers or networks, limit merchants' options when given the ability to choose how to process transactions. "The principal fallacy with the Merchants' argument," the Board aptly explains, "is that they selectively view transactions only from their own perspective and only *after* the point at which the merchant itself or the consumer may have elected to restrict certain routing options," whereas "section 920(b) speaks only in terms of *issuer* and *payment card network* restrictions" imposed prior to initiation of any particular debit card transaction. Reply Br. 2–3.

In sum, far from summiting the steep hill, the merchants have barely left basecamp. We therefore defer to the Board's reasonable interpretation of section 920(b) and reject the merchants' challenges to the anti-exclusivity rule.

## IV.

For the foregoing reasons, we reverse the district court's grant of summary judgment to the merchants and remand for further proceedings consistent with this opinion.

*So ordered.*