# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 25, 2015          Decided July 28, 2015

No. 11-1302

EME HOMER CITY GENERATION, L.P.,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

SAN MIGUEL ELECTRIC COOPERATIVE, ET AL.,
INTERVENORS

Consolidated with 11-1315, 11-1323, 11-1329, 11-1338,
11-1340, 11-1350, 11-1357, 11-1358, 11-1359, 11-1360,
11-1361, 11-1362, 11-1364, 11-1365, 11-1366, 11-1367,
11-1368, 11-1369, 11-1371, 11-1372, 11-1373, 11-1374,
11-1375, 11-1376, 11-1377, 11-1378, 11-1379, 11-1380,
11-1381, 11-1382, 11-1383, 11-1384, 11-1385, 11-1386,
11-1388, 11-1389, 11-1390, 11-1391, 11-1392, 11-1393,
11-1394, 11-1395

On Petitions for Review of a Final Rule Promulgated by
the United States Environmental Protection Agency

*Bill Davis*, Assistant Solicitor General, Office of the
Attorney General for the State of Texas, argued the cause for

State and Local Petitioners. With him on the briefs on remand were *Ken Paxton*, Attorney General, *Jon Niermann*, Chief, Environmental Protection Division, *Mark Walters*, Assistant Attorney General, *Derek Schmidt*, Attorney General, Office of the Attorney General for the State of Kansas, *Jeffrey A. Chanay*, Chief Deputy Attorney General, *Pamela Jo Bondi*, Attorney General, Office of the Attorney General for the State of Florida, *Jonathan A. Glogau*, Chief, Complex Litigation, *Henry V. Nickel*, *George P. Sibley III*, *Luther Strange*, Attorney General, Office of the Attorney General for the State of Alabama, *Robert D. Tambling*, Assistant Attorney General, *Greg Zoeller*, Attorney General, Office of the Attorney General for the State of Indiana, *Thomas M. Fisher*, Solicitor General, *David R. Taggart*, *Samuel S. Olens*, Attorney General, Office of the Attorney of the State of Georgia, *John E. Hennelly* and *James D. Coots*, Senior Assistant Attorneys General, *James D. "Buddy" Caldwell*, Attorney General, Office of the Attorney General for the State of Louisiana, *Megan K. Terrell*, Assistant Attorney General, *Herman Robinson*, *Jackie M. Marve*, *Elliott Vega*, *Donald Trahan*, *Deidra Johnson*, *Kathy M. Wright*, *Aaron D. Lindstrom*, Solicitor General, Office of the Attorney General for the State of Michigan, *Neil David Gordon*, Assistant Attorney General, *Sean Peter Manning*, Chief, Environmental, Natural Resources, and Agriculture Division, *Blake Johnson*, Assistant Attorney General, *Doug Peterson*, Attorney General, Office of the Attorney General for the State of Nebraska, *Harold E. Pizzetta III*, Assistant Attorney General, Office of the Attorney General for the State of Mississippi, *E. Scott Pruitt*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Patrick Wyrick*, Solicitor General, *P. Clayton Eubanks*, Deputy Solicitor General, *J.B. Van Hollen*, Attorney General at the time the brief was filed, Office of the Attorney General for the State of Wisconsin, *Thomas J. Dawson*, Assistant Attorney General,

*Michael DeWine*, Attorney General, Office of the Attorney General for the State of Ohio, *Dale T. Vitale*, *Gregg H. Bachmann* and *Elizabeth Ewing*, Assistant Attorneys General, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *James Emory Smith, Jr.*, Deputy Solicitor General, and *Leslie Sue Ritts*. *William J. Cobb* for the State of South Carolina entered an appearance.

*Peter D. Keisler* argued the cause for Industry and Labor Petitioners. With him on the briefs on remand were *C. Frederick Beckner III*, *Roger R. Martella, Jr.*, *Eric D. McArthur*, *Benjamin Beaton*, *F. William Brownell*, *P. Stephen Gidiere III*, *Grant Crandall*, *Arthur Traynor III*, *Eugene M. Trisko*, *Ann M. Seha*, *Daniel J. Kelly*, *William M. Bumpers*, *Joshua B. Frank*, *Megan H. Berge*, *Kelly M. McQueen*, *Janet J. Henry*, *Robert A. Manning*, *Joseph A. Brown*, *Mohammad O. Jazil*, *Bart E. Cassidy*, *Katherine L. Vaccaro*, *Todd E. Palmer*, *Jordan J. Hemaidan*, *Valerie L. Green*, *Jeffrey L. Landsman*, *Vincent M. Mele*, *Richard G. Stoll*, *Brian H. Potts*, *Steven G. McKinney*, *C. Grady Moore III*, *Ben H. Stone*, *Terese T. Wyly*, *Karl R. Moor*, *William L. Wehrum, Jr.*, *Margaret Claiborne Campbell*, *Bryon W. Kirkpatrick*, *Hahnah Williams Gaines*, *James S. Alves*, *Gary V. Perko*, *David M. Flannery*, *Kathy G. Beckett*, *Laura M. Goldfarb*, *Peter S. Glaser*, *Andrea Bear Field*, *Norman W. Fichthorn*, *E. Carter Chandler Clements*, *David R. Tripp*, *Dennis Lane*, *William F. Lane*, and *Maureen Harbourt*.

*Shannon L. Goessling* and *Michael J. Nasi* were on the brief for intervenor San Miguel Electric Cooperative, Inc. and Amicus Southeastern Legal Foundation, Inc. in support of petitioners on remand. *Robert M. Cohan* entered an appearance.

*Norman L. Rave*, *Jr.* and *Jessica O'Donnell*, Attorneys, U.S. Department of Justice, argued the causes for respondents. With them on the brief were *John C. Cruden*, Assistant Attorney General, and *Stephanie Hogan*, Attorney, U.S. Environmental Protection Agency.

*Andrew G. Frank*, Assistant Attorney General, Office of the Attorney General for the State of New York, argued the cause for State and Local Intervenors in support of respondent. With him on the brief on remand were *Eric T. Schneiderman*, Attorney General, *Barbara D. Underwood*, Solicitor General, *Steven C. Wu*, Deputy Solicitor General, *Michael J. Myers*, Assistant Attorney General, *Brian E. Frosh*, Attorney General, Office of the Attorney General for the State of Maryland, *Mary E. Raivel*, Assistant Attorney General, *Roy Cooper*, Attorney General, Office of the Attorney General for the State of North Carolina, *Marc Bernstein*, Special Deputy Attorney General, *Peter F. Kilmartin*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Gregory S. Schultz*, Assistant Attorney General, *George Jepsen*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kimberly P. Massicotte* and *Scott N. Koschwitz*, Assistant Attorneys General, *Matthew Denn*, Attorney General, Office of the Attorney General for the State of Delaware, *Valerie M. Edge*, Deputy Attorney General, *Lisa Madigan*, Attorney General, Office of the Attorney General for the State of Illinois, *Matthew J. Dunn* and *Gerald T. Karr*, Assistant Attorneys General, *William J. Moore III*, *Benna Ruth Solomon*, *Carrie Noteboom*, *William H. Sorrell*, Attorney General, Office of the Attorney General for the State of Vermont, *Thea Schwartz*, Assistant Attorney General, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Frederick D. Augenstern*, Assistant Attorney General, *Karl Racine*,

Attorney General, Office of the Attorney General for the District of Columbia, *Todd Kim*, Solicitor General, *Scott J. Schwarz*, and *William R. Phelan*, *Jr.*

*Graham G. McCahan* argued the cause for Public Health Respondent Intervenors. With him on the brief on remand were *Howard I. Fox*, *David S. Baron*, *Josh Stebbins*, *Vickie L. Patton*, *Sean H. Donahue*, *David Marshall*, *John Walke*, and *Emily Davis*. *Ann B. Weeks* entered an appearance.

*Brendan K. Collins* argued the cause for Industry Respondent Intervenors. With him on the brief on remand were *Robert B. McKinstry*, *Jr.*, *Lorene L. Boudreau*, and *James W. Rubin*.

Before: ROGERS, GRIFFITH, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: The Clean Air Act requires EPA to set national ambient air quality standards, or NAAQS. Those standards limit the levels of common pollutants in the ambient air. *See* 42 U.S.C. § 7409(a). Under the Act, individual States are responsible for ensuring attainment within their States of federal air quality standards. But air pollution is "heedless of state boundaries." *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1593, slip op. at 2 (2014). Emissions in upwind States therefore may affect air quality in downwind States. The Clean Air Act's "good neighbor" provision speaks to that problem by proscribing upwind States from "emitting any air pollutant in amounts" that will "contribute significantly to nonattainment" of a NAAQS in a downwind State. 42 U.S.C. § 7410(a)(2)(D)(i).

This case concerns EPA's effort to regulate interstate air pollution pursuant to the good neighbor provision.

In 2011, EPA promulgated its latest good neighbor regulation, the Transport Rule, also known as the Cross-State Air Pollution Rule. A number of States, localities, and industry groups promptly challenged the Rule. They argued, among other things, that the Rule's methodology for computing the upwind States' emissions reduction obligations under the good neighbor provision exceeded EPA's statutory authority. As relevant here, they contended that the Rule imposed *uniform* pollution reductions on upwind States regardless of the actual amounts of pollution that individual upwind States contributed to downwind States. According to petitioners, this methodology led to over-control of upwind States' emissions. Applying our precedents in *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008), and *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000), this Court issued a 2-1 decision, with Judge Rogers dissenting, that agreed with petitioners and vacated the Rule. *See EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 38 (D.C. Cir. 2012).

On review, the Supreme Court reversed in a 6-2 decision. The Court ruled that the over-control problem did not require invalidation of the Rule "on its face." *EME Homer*, 134 S. Ct. at 1609, slip op. at 31. In doing so, however, the Court stated that it "agree[d] with the Court of Appeals to this extent": The Transport Rule requires "unnecessary" emissions reductions when EPA "requires an upwind State to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked." *Id.* at 1608-09, slip op. at 29-31. The Court stated that over-control of individual upwind States could be

contested through "particularized, as-applied challenge[s]." *Id.* at 1609, slip op. at 31.

Now on remand, we consider several as-applied over-control challenges to EPA's 2014 emissions budgets. Petitioners challenge the 2014 $SO_2$ emissions budgets for Texas, Alabama, Georgia, and South Carolina. Petitioners also challenge the 2014 ozone-season $NO_X$ emissions budgets for Florida, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, Virginia, and West Virginia. On this record, petitioners' as-applied challenges are meritorious, and those 2014 emissions budgets are invalid. We therefore grant the petitions to that limited extent, and we remand without vacatur to EPA for it to reconsider those 2014 emissions budgets.

In this opinion, we also must address a number of petitioners' broader challenges to the Transport Rule that we did not have occasion to address in the prior case. We reject all of those claims and deny the petitions with respect to those issues.

I

The Transport Rule has been described in exhaustive detail in earlier phases of this litigation. *See EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1593-95, slip op. at 2-6 (2014). We summarize the main points here.

The Clean Air Act regulates air quality through a federal-state collaboration. First, EPA establishes air quality standards known as NAAQS. *See* 42 U.S.C. § 7409(a). Then, EPA identifies areas within the States that have not attained those NAAQS. *See id.* § 7407(d). Those are called "nonattainment" areas. *Id.* Next, the baton is passed to the States, which have the first opportunity to enact plans that

provide for the "implementation, maintenance, and enforcement" of the NAAQS. *Id.* § 7410(a)(1). States typically must enact and submit their plans – called State Implementation Plans or SIPs – within three years of any new or revised NAAQS. *Id.* If a State declines to submit a SIP, or if EPA finds that the State's SIP fails to satisfy the minimum criteria of the Clean Air Act, EPA must promulgate a Federal Implementation Plan, or FIP, in its stead. *See id.* § 7410(c)(1).

Pollution emitted in upwind States can travel to downwind States. As a result, some "downwind States to which the pollution travels are unable to achieve clean air because of the influx of out-of-state pollution." *EME Homer*, 134 S. Ct. at 1593, slip op. at 1.

The Clean Air Act's good neighbor provision addresses the issue of interstate air pollution. That provision, as currently phrased, requires State SIPs to:

> contain adequate provisions –
>> (i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will –
>>> (I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard . . . .

42 U.S.C. § 7410(a)(2)(D).[1]

---

[1] The Rule imposes good neighbor obligations based on emissions that "contribute significantly to nonattainment" of

The Transport Rule at issue here represents EPA's latest effort to implement the requirements of the good neighbor provision. The Rule focuses on three NAAQS. (NAAQS regulate individual pollutants measured over a specified time period.) The NAAQS covered by the Transport Rule are the 8-hour ozone NAAQS, the annual particulate matter (or $PM_{2.5}$) NAAQS, and the 24-hour $PM_{2.5}$ NAAQS. *See* Transport Rule, 76 Fed. Reg. 48,208, 48,209 (Aug. 8, 2011).

The Transport Rule does not directly regulate ozone and $PM_{2.5}$. As gases are "carried downwind, they are transformed, through various chemical processes, into altogether different pollutants." *EME Homer*, 134 S. Ct. at 1594, slip op. at 3. The pollutants that become ozone in downwind States start out in upwind States as emissions of nitrogen oxide ($NO_X$). *See* Transport Rule, 76 Fed. Reg. at 48,209-10. The pollutants that become $PM_{2.5}$ in downwind States start out in upwind States as emissions of $NO_X$ and sulfur dioxide ($SO_2$). *Id.* Therefore, the Transport Rule promotes downwind attainment of ozone and $PM_{2.5}$ NAAQS by limiting $NO_X$ and $SO_2$ emissions in upwind States.

The Transport Rule employed a "two-step approach" to determine whether and to what extent a State must reduce its $NO_X$ and $SO_2$ emissions pursuant to the good neighbor provision. *EME Homer*, 134 S. Ct. at 1596, slip op. at 7.

In the first step, EPA identified the upwind States that "contribute significantly" to nonattainment of NAAQS in one

NAAQS in downwind States *and* emissions that "interfere with maintenance" of NAAQS in downwind States. For ease of discussion, we focus on the "contribute significantly to nonattainment" prong. But our analysis of over-control applies to both prongs.

or more downwind States.  *See id.*  If a downwind State's receptor site is not in attainment and if an upwind State caused more than 1% of the pollution at that site, then that upwind State was deemed to have "contributed significantly." *See id.*  (Receptor sites are locations in downwind States where EPA measures ambient air quality for pollutants regulated by the Clean Air Act.  *See id.*)

When an upwind State was found to contribute 1% or more of the relevant pollution at a downwind receptor, that upwind State was deemed to have a "linkage" to that downwind location.  *See* Transport Rule, 76 Fed. Reg. at 48,236.  Any State with no such linkages was "screened out and exempted from regulation under the rule."  *EME Homer*, 134 S. Ct. at 1596, slip op. at 7.  Any State that had at least one linkage was subject to the Transport Rule.  *See id.*  EPA found 27 upwind States to have one or more linkages in downwind States.  *See id.*  Those 27 States were then subject to the second step of the Transport Rule.

In the second step, EPA calculated the pollution reductions necessary for those 27 upwind States to comply with their good neighbor obligations.  Recall that the good neighbor provision of the Act prohibits upwind States from emitting "amounts" of pollution that "contribute significantly" to nonattainment in downwind States.  42 U.S.C. § 7410(a)(2)(D).  EPA's task at this second step was to decide what "amounts" of pollution each upwind State needed to reduce.

But given what it described as the complexity of trying to assess the relative amount that each upwind State contributes to nonattainment in each downwind State, EPA decided to impose *uniform* emissions reductions on the upwind States covered by the Rule.  *See EME Homer*, 134 S. Ct. at 1607, slip op. at 26-27.  In other words, once a State was deemed

subject to the Transport Rule, its obligation to reduce emissions would no longer depend on the actual amounts it emitted into individual downwind States.

Using its uniform approach, EPA calculated how much pollution each upwind State could eliminate if all of its sources applied pollution control technologies available at particular cost thresholds. *See id.* at 1596, slip op. at 7-8. Those cost thresholds were expressed in terms of cost per ton of emissions reduced.

In the end, EPA adopted four cost thresholds for the 27 upwind States subject to the Transport Rule. For all States subject to the Rule for annual $NO_X$, EPA set a $500/ton cost threshold. *See* Transport Rule, 76 Fed. Reg. at 48,250. For States subject to the Rule for ozone-season $NO_X$, EPA also set a $500/ton cost threshold. *See id.* For States subject to the Rule for $SO_2$, EPA divided the States into two groups. For Group 1 States, EPA set a $2,300/ton cost threshold. *See id.* at 48,259.[2] For Group 2 States, EPA set a $500/ton cost threshold. *See id.*[3]

In the prior round of litigation, petitioners disputed EPA's method of calculating emissions budgets for upwind States, and this Court found three main problems with EPA's approach. First, the Rule could lead to over-control of upwind States – that is, emissions reductions beyond those

---

[2] Group 1 States are Illinois, Indiana, Iowa, Kentucky, Maryland, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and Wisconsin. *See* Transport Rule, 76 Fed. Reg. at 48,257.

[3] Group 2 States are Alabama, Georgia, Kansas, Minnesota, Nebraska, South Carolina, and Texas. *See* Transport Rule, 76 Fed. Reg. at 48,257.

necessary to achieve attainment in downwind States.  Second, the Rule could require States to reduce even insignificant contributions to pollution in downwind States.  Third, the Rule did not purport to try to assess each upwind State's relative contribution to nonattainment in downwind States. We therefore concluded that EPA's methodology violated the Clean Air Act, and vacated the Transport Rule.

The Supreme Court largely agreed with this Court on the first two issues but not on the third.  The Court concluded, moreover, that those first two issues did not support "wholesale invalidation" of the Transport Rule.  *EME Homer*, 134 S. Ct. at 1608, slip op. at 29.

Most important for present purposes is the first issue, over-control.  The Supreme Court "agree[d] with the Court of Appeals to this extent":  The Transport Rule violates the statute when it "requires an upwind State to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked."  *Id.*

But the Supreme Court concluded that the potential "over-control" did not "justif[y] wholesale invalidation of the Transport Rule."  *Id.* at 1608, slip op. at 28-29.  Rather, as relevant here, if "any upwind State concludes it has been forced to regulate emissions . . . beyond the point necessary to bring all downwind States into attainment, that State may bring a particularized, as-applied challenge to the Transport Rule."  *Id.* at 1609, slip op. at 31.

That's where we are now.

## II

We start by addressing petitioners' as-applied challenges to the Transport Rule.

13

A

As the Supreme Court stated in *EME Homer*, the Clean Air Act authorizes EPA to "prohibit[] only upwind emissions that contribute significantly to downwind *nonattainment*." *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1604, slip op. at 21 (2014); *see also id.* at 1607, slip op. at 27 (EPA may "require the elimination of only those 'amounts' of pollutants that contribute to the nonattainment of NAAQS in downwind States."); *id.* at 1603-04, slip op. at 21 ("EPA's task is to reduce upwind pollution, but only in 'amounts' that push a downwind State's pollution concentrations above the relevant NAAQS.").[4]

In *EME Homer*, the Supreme Court rejected a facial challenge to EPA's uniform approach and recognized that EPA must have some leeway to balance the possibilities of over-control and under-control of interstate emissions. The Court stated, however, that an upwind State may bring an as-applied challenge to EPA's Transport Rule emissions budgets when EPA's uniform approach has gone too far in proscribing emissions by upwind States. *Id.* at 1608-09, slip op. at 29-31. In such an as-applied challenge, how do we determine whether EPA has gone too far?

---

[4] The Supreme Court held that the same was true for upwind States that "interfere with maintenance" at downwind locations. *See EME Homer*, 134 S. Ct. at 1604 n.18, slip op. at 22 n.18 ("Just as EPA is constrained, under the first part of the Good Neighbor Provision, to eliminate only those amounts that 'contribute . . . to *nonattainment*,' EPA is limited, by the second part of the provision, to reduce only by 'amounts' that 'interfere with *maintenance*,' *i.e.,* by just enough to permit an already-attaining State to maintain satisfactory air quality.").

The Supreme Court answered that question in *EME Homer*. As relevant here, it stated that EPA may not require "an upwind State to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked." *Id.* at 1608, slip op. at 29. If EPA does so, "the Agency will have overstepped its authority, under the Good Neighbor Provision, to eliminate those amounts that contribute to nonattainment." *Id.* (alterations and internal quotation marks omitted).

When can we say that an upwind State has been required, in the Supreme Court's words, "to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked"? The answer again is clear from the Supreme Court's *EME Homer* opinion: when those downwind locations would achieve attainment even if less stringent emissions limits were imposed on the upwind States linked to those locations. *Id.* at 1609, slip op. at 30-31.

For example, assume that a downwind location would meet its NAAQS if the upwind States to which it is linked implemented emissions reduction technologies available at a cost of $100/ton. Once those technologies are in place, the downwind location will be in attainment. If the upwind States also implemented emissions reduction technologies available at a cost of $200/ton, the emissions reductions that flow from those technologies would not help the downwind location reach attainment because it already reached attainment when technologies available at a cost of $100/ton were implemented.

In evaluating petitioners' as-applied challenges, we thus must determine whether a downwind location would still attain its NAAQS if linked upwind States were subject to less stringent emissions limits. If we answer in the affirmative, EPA has overstepped its authority. Importantly, that does not

mean that every such upwind State would then be entitled to less stringent emissions limits.  Some of those upwind States may still be subject to the more stringent emissions limits so as not to cause *other* downwind locations to which those States are linked to fall into nonattainment.  Otherwise, however, upwind States in those circumstances should prevail in their as-applied challenges.[5]

## B

## 1

Invoking *EME Homer*'s explicit authorization of as-applied challenges, petitioners challenge the 2014 $SO_2$ emissions budgets for Texas, Alabama, Georgia, and South Carolina.  Recall that $SO_2$ emissions transform (along with annual $NO_X$) into $PM_{2.5}$ in downwind States.

We begin with Texas.  At step one of its process for computing emissions budgets under the Transport Rule, EPA found Texas to be linked to $PM_{2.5}$ nonattainment at only one downwind location, Madison, Illinois (171191007).  Air Quality Modeling Final Rule Technical Support Document (June 2011), J.A. 2716.  At step two, EPA grouped Texas with six other States and found that collectively those States must reduce emissions at the \$500/ton level in 2014.  Transport Rule, 76 Fed. Reg. 48,208, 48,257 (Aug. 8, 2011).

---

[5] What if the downwind location would still reach attainment if *one* upwind State's emissions limits were relaxed, but only so long as the *other* upwind States' emissions limits were kept the same?  We are not certain how the Supreme Court in *EME Homer* meant to resolve that question, but that issue is not presented in this case.  Here, as we will explain, we know from EPA's own data that the relevant downwind locations could reach attainment even if *all* of the relevant upwind States' emissions limits were relaxed *in a uniform manner*.

However, EPA's Technical Support Document for the Transport Rule – a document that EPA prepared when it proposed the Transport Rule – reveals that Madison, Illinois, would attain its annual $PM_{2.5}$ NAAQS even if all of the upwind States linked to it implemented emissions reductions available at the \$100/ton cost threshold. *See* Technical Support Document, Analysis to Quantify Significant Contribution (July 2010), J.A. 2231.[6]

Without any good neighbor reductions, Madison's maximum pollution level for $PM_{2.5}$ would be 16.85 μg/m$^3$ in 2012. J.A. 2231. The NAAQS for annual $PM_{2.5}$ is 15 μg/m$^3$. *See* Transport Rule, 76 Fed. Reg. at 48,218. Madison therefore needed to reduce its pollution by 1.85 μg/m$^3$. According to EPA's projections, if every State connected to Madison implemented pollution controls at a cost of \$100/ton, Madison would reduce its $PM_{2.5}$ by at least that amount in 2014. *See* J.A. 2231.

Yet EPA required every State connected to Madison to implement pollution controls available at a cost of \$500/ton or greater.[7] But EPA's projections showed that if every State

---

[6] At oral argument, EPA stated that it "changed the inputs into the models between proposal and final [Rule], so we don't know if" the analysis in the Technical Support Document "still is true." Tr. of Oral Arg. 58-59. But in the final Rule, EPA did not provide any updated analysis regarding cost thresholds below \$500/ton. Therefore, for the purposes of these proceedings, we may and must rely on EPA's initial analysis of those lower thresholds. On remand, EPA may of course update its analysis, but it must consider cost thresholds below \$500/ton and it must justify its final calculation consistent with the directions set forth by the Supreme Court and this Court.

[7] Some States connected to Madison are in Group 1 for $SO_2$, which must implement pollution controls at \$2,300/ton. *See*

connected to Madison implemented pollution controls available at \$500/ton, Madison's $PM_{2.5}$ would go down by 2.61 μg/m$^3$. J.A. 2231. That is 0.76 μg/m$^3$ more than Madison needed to reduce in order to comply with its NAAQS.

Put another way, by requiring reductions of \$500/ton or greater for the upwind States linked to Madison, EPA required those States to help Madison *overachieve* its NAAQS by at least 0.76 μg/m$^3$.

Texas is linked only to Madison, Illinois. Therefore, by requiring Texas to implement pollution controls available at \$500/ton when controls in all contributing upwind States at \$100/ton would bring Madison into attainment, EPA has required Texas "to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked," in clear violation of the Supreme Court's directive. *EME Homer*, 134 S. Ct. at 1608, slip op. at 29.

EPA similarly required Alabama, Georgia, and South Carolina to implement unnecessary emissions controls in their 2014 $SO_2$ emissions budgets.

Alabama is linked to four downwind locations: Fulton, Georgia (131210039), Hamilton, Ohio (390610014), Hamilton, Ohio (390610042), and Hamilton, Ohio (390618001). *See* J.A. 2715. Note that some counties contain multiple receptor locations where EPA measures air quality; each location is demarcated with a unique identification number. EPA's projections show that Fulton, Georgia, will come into attainment even if all States linked to

---

Transport Rule, 76 Fed. Reg. at 48,259. Texas is in Group 2 for $SO_2$, which requires pollution controls at \$500/ton. *Id.*

it implement no good neighbor reductions in 2014. Moreover, all three locations in Hamilton, Ohio, will come into attainment even if all upwind States linked to them implement cost controls at $100/ton. *See* J.A. 2231. EPA is requiring Alabama to implement cost controls at $500/ton, when cost controls at $100/ton would bring every downwind location to which it is linked into attainment.

Georgia is connected to two downwind locations: Jefferson, Alabama (10730023) and Jefferson, Alabama (10732003). *See* J.A. 2715. EPA's projections show that Jefferson, Alabama (10730023) will come into attainment if all States linked to it implement cost controls at $400/ton and Jefferson, Alabama (10732003) will come into attainment if all upwind States linked to it implement cost controls at $200/ton. *See* J.A. 2231. EPA is requiring Georgia to implement cost controls at $500/ton, when cost controls at $400/ton would bring every downwind location to which it is linked into attainment.

South Carolina is linked to one location, Fulton, Georgia (131210039). *See* J.A. 2716. EPA's projections showed that that location would come into attainment if all upwind States linked to it implemented no cost controls. J.A. 2231. Yet EPA is requiring South Carolina to implement pollution controls at $500/ton.

In short, EPA's 2014 $SO_2$ emissions budgets for Texas, Alabama, Georgia, and South Carolina require each of those States "to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked." *EME Homer*, 134 S. Ct. at 1608, slip op. at 29. The reductions on those four States are "unnecessary to downwind attainment *anywhere*." *Id.* at 1609, slip op. at 30. Those emissions budgets are therefore invalid.

2

Next, we consider as-applied challenges to the Transport Rule's 2014 ozone-season $NO_X$ emissions budgets related to the 1997 8-hour ozone NAAQS. Petitioners bring as-applied challenges to those 2014 budgets for Florida, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, Virginia, and West Virginia.

For ozone-season $NO_X$, the only record data showed that the downwind locations to which 10 of those 11 upwind States (all but Texas) were linked would comply with their NAAQS in 2014 even with no good neighbor obligation on the upwind States. *See* Transport Rule, 76 Fed. Reg. at 48,246 (linkages); J.A. 2550-76 (2014 Base Case Maximum Values). The conclusion is therefore simple. The 2014 ozone-season $NO_X$ emissions budgets for those upwind States are invalid.

For Texas, petitioners acknowledge that some good neighbor obligation for ozone-season $NO_X$ may be appropriate, but they say that it must be far lower than $500/ton. The record supports their argument. The evidence indicates that the two downwind locations to which Texas is linked for ozone – East Baton Rouge, Louisiana and Allegan, Michigan – could comply with their NAAQS even if the upwind States to which those two locations were linked were subject to cost thresholds far lower than $500/ton. The 2014 ozone-season $NO_X$ emissions budget for Texas is therefore invalid.

C

Despite those rather clear transgressions of the statutory boundaries as set forth by the Supreme Court in *EME Homer*, EPA argues that petitioners' over-control challenges should

fail. EPA advances two main arguments, neither of which is persuasive in light of the Supreme Court's opinion.

*First*, EPA contends that over-attainment in downwind locations does not mean that there is impermissible over-control of upwind States. Regarding Texas, for instance, EPA says that Madison's over-attainment "reflects incidental benefits flowing from emission reductions by other upwind States that are necessary to" achieve attainment at other downwind locations. EPA Br. at 53-54.

EPA's argument directly contravenes the Supreme Court's analysis in *EME Homer*. According to the Supreme Court, over-attainment in downwind locations is permissible when it is "incidental to reductions necessary to ensure attainment elsewhere." *EME Homer*, 134 S. Ct. at 1608, slip op. at 29. That happens, for instance, when "the emissions reduction required to bring one linked downwind State into attainment" is "large enough to push other linked downwind States over the attainment line." *Id.*

The Supreme Court made crystal clear in *EME Homer* that over-attainment in downwind locations is impermissible when that excess attainment is "unnecessary." *Id.* at 1609, slip op. at 29-30. "If EPA requires an upwind State to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked, the Agency will have overstepped its authority." *Id.* at 1608, slip op. at 29. That is precisely what we have here.

Two examples of upwind States' linkages to Madison, Illinois, illustrate the difference between permissible and impermissible over-attainment at downwind locations.

The upwind State of Indiana is linked to Madison, Illinois, as well as to 11 other downwind locations for annual $PM_{2.5}$.

*See* J.A. 2715. To reach attainment, one of those downwind locations in Allegheny, Pennsylvania, needs all upwind States to which it is linked to implement cost controls at $2,300/ton or higher. *See* J.A. 2715-16; Transport Rule, 76 Fed. Reg. at 48,257. Therefore, regardless of the cost threshold that is necessary to bring Madison into attainment, Indiana must implement controls available at $2,300/ton in order to satisfy its good neighbor obligation to Allegheny. As a result, the benefits that Madison, Illinois, receives from those higher controls on Indiana are merely incidental to the reductions on Indiana that are necessary to bring other locations into attainment.

The upwind State of Texas, by contrast, is linked only to Madison, Illinois for annual $PM_{2.5}$. Madison will come into attainment for annual $PM_{2.5}$ if all States linked to it implement cost controls at $100/ton. If EPA requires Texas to implement cost controls at $500/ton, the over-attainment that Madison would achieve because of Texas's incremental cost controls would not be an "incidental" benefit of other necessary good neighbor reductions imposed on Texas. Texas does not contribute significantly to nonattainment for $PM_{2.5}$ at any other downwind location. Therefore, those $500/ton reductions from Texas cannot be necessary to – or even aid in – the achievement of attainment at any other downwind location. Requiring Texas to implement higher cost controls does not produce benefits that are "incidental" to attainment elsewhere; it produces benefits that are "unnecessary to downwind attainment *anywhere*." *EME Homer*, 134 S. Ct. at 1609, slip op. at 29-30.

*Second*, EPA argues that "imposing less stringent emission budgets" on those upwind States "would be inequitable and contrary to the rationale underlying uniform cost thresholds." EPA Br. at 55. Specifically, EPA says that

uniform cost thresholds are important because they subject "to stricter regulation those States that have done relatively less in the past to control their pollution" and prevent those States from "free riding on their neighbors' efforts to reduce pollution." *Id.* (quoting *EME Homer*, 134 S. Ct. at 1607, slip op. at 27).

But EPA's argument again flatly contradicts the crystalline holding of the Supreme Court in *EME Homer*. The Supreme Court could not have said it more clearly: "If EPA requires an upwind State to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked, the Agency will have overstepped its authority." *EME Homer*, 134 S. Ct. at 1608, slip op. at 29. The Court therefore explicitly authorized as-applied challenges that, when successful under the principles outlined by the Court, will *necessarily* mean a lack of uniformity in certain circumstances.

It bears mention, moreover, that the Supreme Court's conclusion on this point tracked the affirmative representation made by the Deputy Solicitor General to the Supreme Court that as-applied over-control challenges by upwind States would be permissible – even though such challenges, when successful, would necessarily mean the cost thresholds would not be uniform.[8] EPA is now saying something to this Court

---

[8] The Supreme Court's language allowing such as-applied over-control challenges was no accident, as examination of the oral argument transcript in that case reveals:

*Justice Sotomayor*: . . . [B]elow, the government conceded that there was a theoretical possibility that some States could be overcontrolled, that they would be implementing measures that would reduce their contributions to pollution below the 1

that is tension with, if not in contravention of, what the Deputy Solicitor General told the Supreme Court.

In sum, EPA's uniform cost thresholds have required States to reduce pollutants beyond the point necessary to

---

percent. Assume that – I think there's a theoretical possibility of that – but that your approach was basically fine.

What would we do about that? First of all, are there measures States can take to get out of the FIP if it's inappropriate to them because of overcontrol? And if not – and how do they do it? I mean, what's the process? If we think there's a flaw, do we vacate the rule? . . . .

*Mr. Stewart [Deputy Solicitor General]*: . . . [E]ven if we win everything that's at issue in this Court, the case is not over. There are a variety of more specific challenges to the details of the rule that the D.C. Circuit found it unnecessary to address. And so if we won on the issues that are before the Court, the case would be remanded and there would be an opportunity for the court below to consider those. And to the extent –

*Chief Justice Roberts*: Including – including the overcontrol argument, or would that have been done?

*Mr. Stewart*: Well, to – to the extent that any State had – and I don't know the – the pending as-applied challenges at this level of detail. But to the extent that any State has a properly preserved challenge to the effect that it is actually likely to be subject to overcontrol, then that could be heard by the court of appeals. The court of appeals could determine both whether that is, in fact, likely to happen and whether, if it does happen, that would render the rule arbitrary and capricious as to that State.

Transcript of Oral Argument at 26:24-28:18, EPA v. EME Homer City Generation, L.P., 134 S. Ct. 1584 (2014) (Nos. 12–1182, 12–1183) (italics added).

achieve downwind attainment. That violates the Supreme Court's clear mandate in *EME Homer*.

D

The next question is the remedy for the invalid 2014 emissions budgets. We will remand *without vacatur* the 2014 emissions budgets that we have found invalid. Although there have been some critiques of the practice of remanding without vacatur, this Court's precedents authorize remand without vacatur in certain limited circumstances. *See, e.g.*, *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008); *Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Administration*, 429 F.3d 1136, 1151 (D.C. Cir. 2005). Here, as petitioners themselves note, vacatur could cause substantial disruption to the trading markets that have developed around the 2014 emissions budgets. *Cf. NACS v. Board of Governors of Federal Reserve System*, 746 F.3d 474, 493 (D.C. Cir. 2014) (remanding without vacating where "disruptive effect of vacatur [wa]s high") (internal quotation marks omitted). Moreover, as petitioners have acknowledged, some good neighbor obligations may be appropriate for some of the relevant upwind States. In these circumstances, remand without vacatur is appropriate.

On remand, EPA, petitioners, or other parties as appropriate may provide new evidence, data, or calculations. To be sure, remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule. With that in mind, we expect and urge EPA to move promptly on remand. If not, petitioners may promptly bring suit against the Administrator for "failure . . . to perform," in addition to other appropriate remedies petitioners may choose to pursue. 42 U.S.C. § 7604(a)(2).

III

We now address petitioners' other challenges to the Transport Rule that we did not have occasion to reach during petitioners' last trip to this Court.

A

To begin with, the State and local petitioners contend that EPA lacked authority to promulgate the Transport Rule FIPs for 22 of the 27 covered States. Starting in 2007, EPA approved SIPs for those 22 States. *See* Transport Rule, 76 Fed. Reg. 48,208, 48,220-21 (Aug. 8, 2011).[9] Those SIPs sought to fulfill the States' good neighbor obligations by complying with the regulatory framework laid out in the 2005 Clean Air Interstate Rule or CAIR.

But in *North Carolina v. EPA* in 2008, this Court found CAIR to be "fundamentally flawed," and instructed EPA to build a replacement for CAIR "from the ground up." *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008). The Court did not vacate CAIR. *See North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008). Our decision in *North Carolina* prompted EPA to develop the Transport Rule.

EPA may promulgate a FIP only if a State declines to submit a SIP or if EPA finds that the State's SIP does not meet all of the applicable requirements of the Clean Air Act. *See* 42 U.S.C. § 7410(c)(1).[10] EPA, in other words, may not

---

[9] Those States are: Alabama, Arkansas, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia, and West Virginia. *See* Transport Rule, 76 Fed. Reg. at 48,220-21.

[10] The full provision provides that:

promulgate a FIP for a State if it has previously approved a SIP for that State. Here, EPA had approved SIPs for 22 of the 27 States covered by the Transport Rule. Therefore, in order to promulgate the Transport Rule FIPs, EPA first needed to revise its approval for the CAIR SIPs.

The Clean Air Act allows EPA to "revise" a prior SIP approval if that approval "was in error." *Id.* § 7410(k)(6). In particular, the Clean Air Act provides that whenever "the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof) . . . was in error, the Administrator may . . . revise such action as appropriate without requiring any further submission from the State." *Id.* Here, EPA invoked its correction powers under Subsection 7410(k)(6) to "rescind any statements that the [CAIR] SIP submissions either satisfy or relieve the state of the obligation to submit a SIP to satisfy the requirements of" the good neighbor provision. *See* Transport Rule, 76 Fed. Reg. at 48,220.

---

The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator – (A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A) of this section, or (B) disapproves a State implementation plan submission in whole or in part, unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

42 U.S.C. § 7410(c)(1).

Petitioners argue that EPA's use of its Subsection 7410(k)(6) correction power was invalid. They advance three distinct contentions.

First, petitioners argue that EPA's initial approval of the CAIR SIPs was not "in error," and therefore could not be corrected pursuant to Subsection 7410(k)(6). But when our decision in *North Carolina* deemed CAIR to be an invalid effort to implement the requirements of the good neighbor provision, that ruling meant that the initial approval of the CAIR SIPs was in error at the time it was done. As the Supreme Court stated: "A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312-13 (1994).

Second, petitioners argue that because we remanded CAIR without vacatur in *North Carolina*, we cannot now conclude that EPA's SIP approvals under CAIR were "in error." But petitioners misunderstand why we declined to vacate CAIR in *North Carolina*. We left CAIR in effect temporarily because doing so was necessary to "at least temporarily preserve the environmental values covered by CAIR" until it could be "replaced by a rule consistent with our opinion." *North Carolina*, 550 F.3d at 1178.

But critically, the decision to remand without vacatur did not alter the core holding of *North Carolina*: CAIR contained "fatal flaws" and needed to be replaced. *North Carolina*, 531 F.3d at 901. Our decision to remand without vacating, therefore, does not change the conclusion that EPA's original approvals of the CAIR SIPs were "in error" given our decision in *North Carolina*.

Third, petitioners say that EPA ran afoul of the Clean Air Act's requirement that EPA correct SIP approval errors "in the same manner as the approval." 42 U.S.C. § 7410(k)(6). We reject that argument because EPA did correct the SIP approvals "in the same manner" as it originally issued them. Both the original SIP approvals and the corrections were effectuated through rulemaking pursuant to the requirements of the Clean Air Act.

It is true that, as petitioners note, EPA approved the original CAIR SIPs through rulemaking with notice and comment, but revised them through rulemaking without notice and comment. *See* Transport Rule, 76 Fed. Reg. at 48,221. But both actions complied with the Clean Air Act's framework for rulemaking.

Under the Clean Air Act, rulemaking can be accomplished without notice and comment when EPA has "good cause" to forgo that extra procedure. *See* 42 U.S.C. § 7607(d)(1). Specifically, the Clean Air Act permits EPA to conduct rulemaking without notice and comment when doing so would be appropriate under Subsection 553(b) of the Administrative Procedure Act, which sets forth a "good cause" exception.[11]

---

[11] The Clean Air Act exempts from its notice and comment requirements "any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5." 42 U.S.C. § 7607(d)(1); *cf. General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 n.6 (D.C. Cir. 1984). Those subparagraphs, in turn, provide two exceptions to the notice and comment requirement: (A) when the agency enacts interpretative rules, and (B) when the agency has good cause to forgo notice and comment. *See* 5 U.S.C. § 553(b)(A)-(B).

Subsection 553(b)(B) provides that an agency has "good cause" to conduct rulemaking without notice and comment when proceeding through notice and comment would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). This Court has previously affirmed the use of the "good cause" exception when rulemaking without notice and comment is "a reasonable and perhaps inevitable response to" a "court order." *American Federation of Government Employees, AFL-CIO v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981).

EPA explained here that it invoked the "good cause" exception because this Court's decision in *North Carolina* invalidated the CAIR SIPs and commentators could not have said anything during a notice and comment period that would have changed that fact. *See* Transport Rule, 76 Fed. Reg. at 48,222 ("EPA must accept the Court's conclusion that compliance with CAIR does not satisfy the requirements of [the good neighbor provision] and lacks discretion to reach a different conclusion."). EPA is correct that it would have been utterly "unnecessary" and wasteful to go through notice and comment given our decision in *North Carolina*. *See* 5 U.S.C. § 553(b)(B).

In sum, EPA's initial approval of the CAIR SIPs was "in error." And EPA corrected that approval "in the same manner" as it approved the SIPs – that is, through a valid rulemaking.[12]

---

[12] Our conclusion on Subsection 7410(k)(6) is limited to the unusual circumstances here, in which a federal court says that EPA lacked statutory authority at the time to approve a SIP. We do not take a position on use of Subsection 7410(k)(6) in any other circumstances.

B

Next, petitioners challenge two models used by EPA to create the Transport Rule. This Court's review of EPA's modeling choices is deferential. It is "only when the model bears no rational relationship to the characteristics of the data to which it is applied that we will hold that the use of the model was arbitrary and capricious." *Appalachian Power Co. v. EPA*, 135 F.3d 791, 802 (D.C. Cir. 1998).

First, petitioners argue that EPA's model for creating air quality projections was arbitrary and capricious because it used insufficient real-world data. In order to project downwind air quality, EPA used real-world data from 2003 to 2007. *See* Transport Rule, 76 Fed. Reg. at 48,233-36. Petitioners argue that EPA should have verified its findings against air quality measured after 2007 as well.

EPA's decision not to use post-2007 air quality data in the model was reasonable. As already discussed, in 2008, this Court invalidated CAIR, but we left that Rule in place until the Agency came up with a replacement. *See North Carolina*, 550 F.3d at 1178. As a result, air quality data after 2007 reflected "large emission reductions from CAIR" that would ultimately be displaced by the Transport Rule. *See* Transport Rule, 76 Fed. Reg. at 48,230.

---

Moreover, given our narrow holding here, EPA's use of its correction power under Subsection 7410(k)(6) should not be read to diminish the scope or force of Subsection 7410(k)(5), which provides that whenever "the Administrator finds that the applicable implementation plan for any area is substantially inadequate . . . the Administrator shall require the State to revise the plan as necessary to correct such inadequacies." 42 U.S.C. § 7410(k)(5).

As EPA reasonably explained, because "the Transport Rule will replace CAIR, we must model a future year base case which does not assume that CAIR is in place (a 'no-CAIR' case)." *Id.*

Second, petitioners object to the model EPA used to set State emissions budgets. That model predicted the generation and emissions produced at electric generating units within the States covered by the Transport Rule. Petitioners say that those predictions were arbitrary because EPA knew that there were "discrepancies" between the predictions and the actual generation and emissions at those units. EPA contends that the model's "discrepancies are small and random and thus do not result in biases." Transport Rule Primary Response to Comments (June 2011), J.A. 2089.

We will not invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world. That possibility is inherent in the enterprise of prediction. The best model might predict that the Nationals will win the World Series in 2015. If that does not happen, you can't necessarily fault the model. As we have said previously, the fact that a "model does not fit every application perfectly is no criticism; a model is meant to simplify reality in order to make it tractable." *Chemical Manufacturers Association v. EPA*, 28 F.3d 1259, 1264 (D.C. Cir. 1994).

## C

Next, petitioners argue that EPA failed to properly regulate pursuant to the "interfere with maintenance" prong of the good neighbor provision. The Transport Rule regulates two different kinds of interstate air pollution. As we have discussed, the Rule regulates upwind emissions that "contribute significantly to nonattainment" of NAAQS in

downwind States. 42 U.S.C. § 7410(a)(2)(D)(i). The Rule also regulates upwind emissions that "interfere with maintenance" of NAAQS in downwind States that have achieved attainment. *Id.*

In *North Carolina*, we held that EPA must give "independent significance" to those prongs. *North Carolina*, 531 F.3d at 910. We found that CAIR failed to do that. CAIR applied the interference with maintenance provision "in conjunction with the significant contribution to nonattainment provision and so did not use the maintenance prong to separately identify upwind States subject to CAIR." *Id.* (quoting 71 Fed. Reg. 25,328, 25,337 (Apr. 28, 2006)). Put another way, areas that found "themselves barely meeting attainment . . . due in part to upwind sources interfering with that attainment ha[d] no recourse under EPA's interpretation of the interference prong" in CAIR. *Id.*

Petitioners argue that the Transport Rule repeats the same error. We disagree.

The Transport Rule's methodology affords independent effect to the "interfere with maintenance" prong of the good neighbor provision. In formulating the Transport Rule, EPA "evaluat[ed] contributions to identified maintenance receptors as well as contributions to identified nonattainment receptors." Transport Rule, 76 Fed. Reg. at 48,227; *see also id.* at 48,212 ("EPA thus identified specific emission reduction responsibilities for each upwind state found to significantly contribute to nonattainment *or* interfere with maintenance in other states.") (emphasis added).

With the Transport Rule, EPA created a distinct category of maintenance receptors that could independently trigger an upwind State's good neighbor obligations. *See id.* at 48,228. Therefore, the Transport Rule complied with *North*

*Carolina*'s requirement that EPA give the nonattainment and maintenance prongs "independent significance."

D

Petitioners also raise several objections to EPA's methodology for identifying upwind States that "interfere with maintenance" at downwind locations.

First, petitioners argue that EPA's methodology for identifying upwind emissions that "interfere with maintenance" failed to "identify and analyze only those upwind emissions that might actually threaten continued attainment." State and Local Br. at 20. Second, they argue that the methodology improperly required emissions reductions in upwind States without accounting for maintenance secured by the downwind States' own maintenance plans.[13] As a result, it risked requiring emissions reductions that would be duplicative or unnecessary. Third, they say that EPA erred by focusing "exclusively on the utility sector for emissions reductions," when that sector may not produce the emissions that interfere with maintenance at downwind locations. *Id.* at 21.

At bottom, each of those claims is an argument that EPA's methodology *could* lead to over-control of upwind States that are found to interfere with maintenance at a downwind location. That could prove to be correct in certain

---

[13] When a State believes that an area within its borders has reached a national air quality standard, that State may seek a "redesignation" of that area from "nonattainment" to attainment. *See* 42 U.S.C. § 7505a(a). That request must be accompanied by a revision to the State's SIP, which "provide[s] for the maintenance of the" NAAQS "for at least 10 years after the redesignation." *Id.* That revision is called a "maintenance plan."

locations.  But the Supreme Court made clear in *EME Homer* that the way to contest instances of over-control is not through generalized claims that EPA's methodology would lead to over-control, but rather through a "particularized, as-applied challenge."  *EME Homer*, 134 S. Ct. at 1609, slip op. at 31.  And petitioners do not point to any actual such instances of over-control at downwind locations.

As the Supreme Court stated, under the "interfere with maintenance" prong, EPA may only limit emissions "by just enough to permit an already-attaining State to maintain satisfactory air quality."  *Id.* at 1604 n.18, slip op. at 22 n.18.  If States have been forced to reduce emissions beyond that point, affected parties will have meritorious as-applied challenges.

E

Finally, petitioners advance three new arguments on remand that we may not entertain at this time.

We may hear objections to EPA rules or procedures only if the objections were "raised with reasonable specificity during the period for public comment."  42 U.S.C. § 7607(d)(7)(B).  If it was "impracticable to raise a particular objection" or if "the grounds for the objection arose after that period," parties still must petition EPA for administrative reconsideration before raising the issue before this Court.  *See Utility Air Regulatory Group v. EPA*, 744 F.3d 741, 746 (D.C. Cir. 2014).  This may sometimes seem a roundabout procedure, but that is what the statute requires and what we therefore must insist upon.  If EPA fails to conduct a reconsideration hearing, the party may seek review of that decision in this Court.  *See* 42 U.S.C. § 7607(d)(7)(B) ("If the Administrator refuses to convene such a proceeding, such

person may seek review of such refusal in the United States court of appeals for the appropriate circuit.").

First, petitioners argue that EPA violated the Clean Air Act's notice and comment requirements by significantly amending the Rule between the proposed and final versions without providing additional opportunity for notice and comment. Because that argument is an objection to the notice and comment process itself, petitioners obviously did not and could not have raised it during the period for public comment. Under Subsection 7607(d)(7)(B), however, the only appropriate path for petitioners to raise this issue is through an initial petition for reconsideration to EPA. At least one party to the present suit has done just that. *See* Br. of Intervenor San Miguel Electric Cooperative, Inc. and Amicus Southeastern Legal Foundation, Inc. at 27. EPA has not ruled on that request, and the parties have not asked for judicial review of EPA's delay in acting. *Id.* We are without authority at this time to reach this question.

Second, petitioners argue that EPA did not have authority to promulgate certain Transport Rule FIPs because those FIPs were signed by the EPA Administrator before EPA published its disapproval of the CAIR SIPs in the Federal Register. Petitioners did not raise this issue before the Agency during notice and comment, and EPA has not denied any petition for reconsideration raising this objection. We therefore may not entertain it now.

Third, petitioners argue that EPA exceeded its authority by finding linkages based on upwind contributions to downwind locations that were designated in "attainment" or "unclassifiable." *See* 42 U.S.C. § 7407(d). Petitioners again did not raise this argument during the notice and comment period or otherwise comply with 42 U.S.C. § 7607(d)(7)(B).

This question is therefore not properly before this Court, and we may not reach it now.

\* \* \*

To sum up: We hold invalid the 2014 $SO_2$ emissions budgets for Alabama, Georgia, South Carolina, and Texas, as well as the 2014 ozone-season $NO_X$ budgets for Florida, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, Virginia, and West Virginia. We remand without vacatur to EPA for it to reconsider those emissions budgets. We reject all of petitioners' other challenges to the Transport Rule, including all of their facial challenges to the Rule. The petitions for review are therefore granted in part and denied in part.

*So ordered.*